**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Marina ZARNES, Michael W. Nietupski, Jeffrey L. Hunter, Benny L. Battles, Michael R. Dionne, Marvin G. Bland, and Thomas J. Nietupski, Defendants–Appellants.**

Nos. 90–3024, 90–3139, 90–3280, 90–3374, 90–3648, 91–1316 and 91–1419.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1994.

Decided Aug. 29, 1994.

David E. Risley (argued), Springfield, IL, for U.S.

Michael H. Vonnahmen, Springfield, IL, for Marina Zarnes.

Jay D. Stein, Stein & Stein, Chicago, IL, for Michael W. Nietupski.

Jeff Justice (argued), Hull, Campbell & Robinson, Decatur, IL, for Jeffrey L. Hunter.

James A. Pappas, Michael J. Costello (argued), Costello Law Office, Springfield, IL, for Benny L. Battles.

Monroe McWard, Taylorville, IL, for Michael R. Dionne.

James T. LaVecchia (argued), William H. Wise, Wise & Kuzas, Chicago, IL, for Marvin G. Bland.

Kevin P. Connor, Chicago, IL, for Thomas J. Nietupski.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

This is a consolidated direct appeal by seven defendants convicted of drug conspiracy and firearms offenses. They raise numerous challenges to their convictions and sentences. For the reasons stated below we affirm the judgments entered by the district court.

## I. FACTUAL BACKGROUND

In 1986, William Zahm began selling small amounts of the drug methamphetamine in the San Diego, California area for his friend Phillip Noble. The next year, in May 1987, Zahm's aunt, Nancy Nietupski, came to San Diego from Yuma, Arizona to visit Zahm's parents. During her stay, Nancy asked Zahm if he knew where she could buy methamphetamine. Nancy said that her ex-husband, Thomas Nietupski, a dentist in Decatur, Illinois, was interested in buying the drug if he could make a profit by reselling it. Zahm told Nancy he had a friend from whom he could get methamphetamine, and arranged a meeting between her and Noble. Nancy and Noble discussed prices, and Noble gave her a small sample of methamphetamine which she mailed to Thomas. Thomas, pleased with the quality of the sample, flew to San Diego in June 1987 to purchase half of a pound of methamphetamine. At Nancy's direction, Zahm picked up the methamphetamine from Noble and gave it to Thomas, who paid Zahm $4,500 in cash.

In October 1987, Nancy Nietupski returned to San Diego and asked Zahm about buying another half of a pound of methamphetamine. Zahm told Nancy that he had a new source for methamphetamine, a woman named Marina Zarnes, who also lived in California. Nancy gave Zahm $70 to buy a sample of methamphetamine from Zarnes. Zahm informed Nancy that Zarnes would sell her half of a pound of methamphetamine for $4,500. Nancy told Zahm that she had contacted Thomas Nietupski, and that Zahm should tell Zarnes she and Thomas wanted to purchase a half pound of methamphetamine. A short time later, Thomas flew to California and gave $4,500 to Zahm, who bought the methamphetamine from Zarnes on Nancy and Thomas's behalf.

In November 1987, Zahm became involved with two men he knew as "Kenny" and "Dusty" who needed financing to start a methamphetamine laboratory near San Diego. Zahm called Nancy Nietupski and asked her to invest $1,000 in the lab in return for half of a pound of methamphetamine. Nancy wired Zahm $800. Nancy and her son Michael Nietupski thereafter drove from Arizona to San Diego where Zahm introduced them to Kenny and Dusty. Michael stayed at Kenny's house and contributed an additional $1,100 for the lab, which was unsuccessful.

In December 1987, Nancy Nietupski and Thomas Nietupski went to California and offered Zahm $1,000 to arrange an introductory meeting with Zarnes. Zahm obliged and took Nancy and Thomas to meet Zarnes. Zarnes had no methamphetamine available that day, but she did sell Nancy and Thomas two kilograms of cocaine and five pounds of marijuana for $27,000. Thomas expressed interest in buying methamphetamine from Zarnes in the future. Thomas said that Nancy would make all the purchases, and that Zarnes should deal directly with Nancy. The women exchanged phone numbers. The next day, the Nietupskis told Zahm that they were able to obtain a pound of methamphetamine from Zarnes. Zahm asked Thomas about his $1,000 commission, but Thomas refused to pay, citing his investment loss in Kenny's and Dusty's lab.

In April 1988, Nancy Nietupski contacted a friend of Michael Nietupski's named Fred Hadowsky, who lived near Pana, Illinois. Nancy told Hadowsky that she needed his help in developing a street-level network for distributing methamphetamine in the Pana, Taylorville, Decatur, and Springfield, Illinois areas, and that Michael said Hadowsky could be trusted. Hadowsky agreed to distribute one-eighth of an ounce quantities for Nancy that she "fronted" (sold on consignment). This arrangement lasted until November 1988 when Hadowsky got behind in his drug debts. Hadowsky recalled that during their transactions Nancy kept a gun inside her purse to prevent anyone from "ripping her off." (Tr. 633).

In May 1988, Nancy Nietupski went on a "drug run" to the west coast. (Tr. 155). Before leaving, Nancy told Cindylou Matthews Anthony ("Matthews"), Violet Blankenship, a drug distributor for her sister, and Bob Blankenship, her nephew, that Nancy only had $15,000 to make her purchases, and that Nancy needed contributions from investors. Matthews, who learned from Violet that Nancy was "the lady in charge" of the methamphetamine business, contributed $1,500. (Tr. 155). In late May or early June 1988, Nancy returned from the west coast with methamphetamine. In partial repayment of Matthews' investment, Nancy gave half of an ounce of methamphetamine to Matthews, who sold about one-eighth to one-fourth of an ounce to Michael Dionne, one of Matthews' main customers. A week later, Nancy fully repaid Matthews for her investment by giving Matthews another half of an ounce of methamphetamine. Nancy thereafter fronted two to four ounces of methamphetamine per week to Matthews, who became Nancy's primary distributor.

In mid-July 1988, Matthews met Nancy Nietupski's son Michael Nietupski. Michael told Matthews that he came from Arizona to Illinois to kill her because Violet Blankenship suspected Matthews was "singing like a bird." (Tr. 168). Michael displayed a revolver as he spoke to Matthews. Michael concluded after speaking with Matthews that Violet's suspicions were baseless. At Matthews' request, Michael obtained about two pounds of methamphetamine. Of this amount, Michael fronted Matthews one-fourth to one-half of a pound, and told Matthews to pay Nancy for this drug delivery.

Matthews saw Michael Nietupski again later that month. Nancy Nietupski asked Michael to exert control over Bob Blankenship, who threatened to harm Matthews if she continued to conduct business with Nancy. Michael arrived in Pana with a gun and several rounds of ammunition. A few days later, Michael told Matthews that he was unable to find Bob, but that he shot at a target range near the Blankenship farmhouse "as a calling card" to make sure Bob knew that he was in town. (Tr. 174).

Towards the end of July 1988, Nancy, Matthews, Matthews' young son, and a man named "Roach" drove to California to see Zarnes. In the course of the drive, Matthews learned from Nancy that Zarnes was her source for drugs, that Nancy had brought money to buy drugs, and that Nancy had arranged for Zarnes to have the drugs ready. When the foursome arrived at Zarnes' trailer, Nancy went inside and purchased half of a pound of methamphetamine and two ounces of cocaine. As Nancy and Zarnes were leaving the trailer, Matthews overheard Zarnes tell Nancy that she was in enough trouble already and did not want to meet anyone new.

From August to mid-September 1988, Matthews distributed greater amounts of methamphetamine (one-quarter to one-half of a pound per week) for Nancy Nietupski, all on a front for $1,600 per ounce. Concomitantly, the amount of methamphetamine Matthews sold to Dionne grew. Matthews fronted one- to two-ounce quantities per week to Dionne, who resold the drugs to Michael Day, Michael Smith, and William Worker, among others. Many of Matthews' deals with Dionne took place at Dionne's apartment, where Matthews saw a large number of handguns, a "miniature machine gun," knives, and "SWAT clothes." (Tr. 224–25). Dionne told Matthews that if she was ever arrested, he would come in like a SWAT team and rescue her from jail. According to customers Day and Smith, Dionne was constantly armed during drug transactions.

In August 1988, Nancy Nietupski told Matthews that she had several other distributors working for her, and that two of them, Benny Battles and Jeffrey Hunter, were particularly trustworthy. While these two men sold less than Matthews, they were "just as valuable" to Nancy. (Tr. 210). Nancy told Matthews that Battles was "very close to her," that Battles could be counted on in an emergency, and that Battles was to be contacted in the event that Nancy was unavailable. (Tr. 216). Nancy also told Matthews that Battles distributed about half as much methamphetamine as Matthews did, which would have amounted to one-eighth to one-quarter of a pound of methamphetamine per week. Mat-

thews frequently saw Battles at Nancy's house. Battles would ask Matthews if Nancy had drugs, or if Matthews knew when Nancy would be receiving drugs. Matthews once overheard Battles tell Nancy that he needed half of a pound of methamphetamine for a motorcycle club. Matthews herself bought drugs from Battles on several occasions.

Matthews also saw Hunter at Nancy Nietupski's house. Nancy told Matthews that Hunter would pick up drugs and drop off money for her. Matthews recalled that Nancy sometimes asked Hunter if he needed more methamphetamine and how his sales were going. Nancy once asked Matthews to tell Hunter and Battles that she would be back shortly. Matthews relayed the message to Hunter and told him that Nancy would have a supply for him. Hunter asked Matthews to tell him when Nancy arrived. Upon her return, Nancy told Matthews she was going to see Hunter. Between July 1988 and December 1988, there were several times when Matthews, Battles, and Hunter met with Nancy and talked openly about their respective drug activities.

In mid-September 1988, Nancy Nietupski told Matthews that she had run out of drugs and was unable to locate Zarnes. Telephone records indicated that Nancy placed numerous calls to Zarnes, who, unbeknownst to Nancy, had been incarcerated for possessing methamphetamine in violation of California law.

In September 1988, Hadowsky was at Nancy Nietupski's house in Pana when Michael Nietupski drove up in a small sports car. Michael took an assault rifle with ammunition out of the trunk and into the house. Later that evening, Michael told Hadowsky that the methamphetamine operation was his, and that he had access to a person in Arizona who was going to "cook" (manufacture) the methamphetamine for him.

In October 1988, Nancy Nietupski visited Zahm in California and told him about her difficulty in locating Zarnes. When Nancy learned that Zahm knew how to manufacture methamphetamine, Nancy offered to pay for a lab in Pana in exchange for Zahm's services as cook. Zahm accepted Nancy's offer. Nancy and Michael Nietupski thereafter ar-

ranged for Zahm to purchase the necessary equipment and chemicals. Nancy informed Zahm that the financing for the lab came from Thomas Nietupski and some people in Pana. After Zahm completed his purchases, Michael questioned Zahm's ability to manufacture methamphetamine. Michael became angry and waived a gun in Zahm's face and shot at the floor by his feet.

In late October 1988, at Nancy Nietupski's direction, Zahm brought the lab equipment to the Blankenship farmhouse. There, Zahm did his first cook, producing two and one-half pounds of methamphetamine. Nancy and Michael Nietupski sold one-half of a pound to buy Michael a Chevrolet Blazer and to pay for other expenses. Zahm helped Michael load the Blazer with clothes and guns, including a .357 revolver that Michael always carried during methamphetamine transactions. Michael's business partner in Phoenix, Allison Nauss, nicknamed him "Scary" because Michael intimidated people when he wore the gun. (Tr. 747). Michael drove the Blazer back to Arizona, taking a pound of methamphetamine with him. Nancy distributed the remaining pound to Matthews, Bob Blankenship, Battles, and Hunter. Nancy eventually paid Zahm $4,000 to $5,000 for the cook.

Zahm was present at Nancy Nietupski's home when Battles came to pick up an ounce of methamphetamine shortly after the first cook. Zahm left with Battles, who told Zahm that he sold one ounce per week for Nancy on a front. Zahm, however, already knew from Nancy that Battles was one of her distributors. At Battles' home, Zahm showed Battles how to convert methamphetamine from powder to rock form. Zahm also extracted half of an ounce of methamphetamine from filters used in the cook. When Battles told Zahm that he lost half of an ounce of methamphetamine while trying to convert the drug from powder to rock form, Zahm gave Battles the half-ounce that he had extracted from the filters so Battles could repay Nancy for the last ounce she had fronted him. Battles thereafter sold methamphetamine to several people, including Dionne, who picked up an eighth of an ounce for resale, and Holland. Both Holland and Zahm saw guns at Battles' home.

In mid-November 1988, Michael Nietupski arranged with Nancy Nietupski to relocate the lab to Phoenix, partly because Nancy lived next to the Pana Police Department. The equipment was taken to Nauss' home in Phoenix. At Nauss' home, Zahm did a small cook in a Crown Royal whiskey bottle, producing one ounce of low-quality methamphetamine which he gave to Michael. Zahm did another small cook at Michael's girlfriend's house, producing one ounce of higher-quality methamphetamine which he gave to Michael and Violet Blankenship. Zahm's most successful cook produced one and a half pounds of methamphetamine, the bulk of which was given to Michael. Attempts were made to obtain additional equipment and to find a suitable location for a laboratory. When Zahm complained to Nancy of the problems in finding a lab site in Phoenix, Nancy instructed him to return the lab to Pana.

Back in Pana, Nancy Nietupski told Zahm that she found a good location for a lab and took him to Randy Neely's farm. With Neely's help, Zahm set up the equipment and, through a process called "gassing," extracted half of a pound of methamphetamine. From this output, Zahm took one ounce for himself. Nancy gave half of an ounce to Neely and kept the rest. The equipment was left at the farm.

Zahm went to Dionne's home with his ounce and some dirty filters from the gassing and stayed there for several days. During his stay, Zahm extracted methamphetamine residue from the filters. Zahm and Dionne took drugs together and sold drugs to customers, including one ounce of methamphetamine to William Worker. Dionne bought Zahm and himself a gun and ammunition.

Shortly after the first gassing, Nancy Nietupski had Hunter drive Zahm back to Neely's farm for a second gassing. On the way out there, Hunter remarked that he knew what Zahm intended to do at the farm. Hunter also stopped at a convenience store so Zahm could purchase coffee filters. Zahm produced nine ounces of methamphetamine from this gassing. Zahm kept four ounces for himself, gave Neely an ounce, and Nancy four ounces.

In December 1988, Zahm took one and one-half ounces of methamphetamine from the second gassing to Hunter, whom he knew distributed for Nancy Nietupski, and asked if Hunter wanted to buy it. Hunter told Zahm that Nancy already fronted him an ounce and he still owed Nancy $2,800. Zahm offered to sell Hunter the ounce and a half for $1,500. Hunter paid Zahm approximately $1,000, saying he needed to keep the rest of the money to pay Nancy. Zahm fronted Hunter the balance. Zahm and Jeffrey Holland, a customer of Hunter's, always saw Hunter carrying a gun in a belt holster.

Zahm told Marvin Bland about the methamphetamine he produced from the second gassing, and suggested they make it themselves. Bland was interested because he was not making much money from his drug deals with Nancy Nietupski. To demonstrate his cooking ability, Zahm wrote a recipe for methamphetamine and gave it to Bland. Bland later drove Zahm to Phoenix to assist Michael Nietupski in extracting methamphetamine from the liquid "meth oil." When Zahm and Bland arrived in Phoenix, Michael was nowhere to be found, so they drove to San Diego, where Zahm bought supplies, then returned to Pana. On their return, Bland helped Zahm collect money from Battles and Hunter for drug purchases. Bland told Battles that he was taking care of Zahm from then on, so no one would be "ripping [Zahm] off" anymore. (Tr. 1519). Bland also assisted Zahm in a small cook in Worker's trailer.

In January 1989, Battles told Zahm he had received $1,000 from a motorcycle club to buy a one-ounce sample of methamphetamine. Zahm bought back the ounce of methamphetamine that he and Dionne sold to Worker and gave it to Battles. Battles discussed with Zahm the idea of buying enough chemicals to cook fifty pounds of methamphetamine at one time, but nothing came of it.

Also in January 1989, Matthews met Nancy Nietupski at a Decatur restaurant. Nancy Nietupski fronted Matthews one-half of an ounce of methamphetamine, which Nancy said came from Thomas Nietupski. The following month, Nancy fronted Matthews an-

other one-half ounce. During this time period, Matthews saw Thomas at Nancy's home. Nancy was "raving" to Thomas about her inability to control Zahm and her desire to eliminate Zahm from the methamphetamine operation. (Tr. 250). Thomas responded that he had a "laser gun" if Nancy needed it. (*Id.*).

On January 21, 1989, Michael Nietupski was arrested in Phoenix for carrying a concealed weapon. A search of Michael's car produced six loaded firearms, a booklet on drug manufacturing, a canister containing 6.2 grams of methamphetamine, and a grinder/sifter containing 240 milligrams of methamphetamine.

At this time, Zahm stopped having contact with Bland and deliberately dropped out of sight. Bland, who was upset with Zahm for telling Nancy Nietupski he would not cook for her, drove to Worker's trailer and shot at the mailbox in an effort to intimidate Zahm. Later, Zahm went to see Bland when Zahm heard from Battles that Bland was no longer angry and was looking for him. Bland told Zahm that he had smoothed things over with Nancy, and that Nancy would let Zahm cook for her. With Nancy's approval, Bland selected Tom Lawrence's farm as the site for the cook. Bland, Zahm, and Nancy agreed to split the methamphetamine produced from the cook three ways.

On February 24, 1989, Bland, Zahm, Nancy Nietupski, Thomas Nietupski, and Neely drove to the Lawrence farm. Thomas transported the lab equipment in his pickup truck and directed the others in setting it up. Zahm told Nancy he anticipated producing seven pounds of methamphetamine from the cook. Based on this figure, Thomas proposed that he and Nancy give Bland and Zahm a pound each and split the rest. Bland and Zahm were amenable to this proposal.

During the cook, Zahm discovered that a necessary piece of equipment was missing. It had been left in Phoenix. Although Zahm could not do a full cook without the piece, he still could extract methamphetamine from the remaining "meth oil." At Thomas Nietupski's request, Zahm explained the extraction process in detail. After Zahm had extracted about an eighth of an ounce of meth-amphetamine, toxic chemicals boiled over and burned his legs, so the cook was discontinued. Nancy had Lawrence store the equipment and chemicals at his farm.

On February 25, 1989, Nancy Nietupski arranged for Michael Nietupski's partner Allison Nauss to fly from Phoenix to Illinois with the missing piece of equipment. Nauss arrived three days later, but the cook was called off because Lawrence got cold feet. Bland transferred the lab equipment from the Lawrence farm to Matthews' house. Nancy and Nauss picked up items that Bland had been storing and took them to Matthews' house as well.

On March 5, 1989, Nancy Nietupski and Nauss visited Hunter at his home. Hunter asked Nancy for methamphetamine. Nancy said that she did not have any, and that she was still trying to find a place to set up the lab. Nancy subsequently bought five ounces of methamphetamine from Nauss, who obtained the drugs from a source in Phoenix.

On March 11, 1989, Zahm and Worker were arrested by federal agents. Following Zahm's arrest, Bland told Matthews that Zahm had given him some "pickle juice" ("meth oil"). Bland proposed that if Matthews arranged for the methamphetamine to be extracted, he would split it 50/50 with her.

On March 23, 1989, police officers searched Nauss' apartment, seizing Michael Nietupski's revolver, records of Michael's drug transactions, and Nauss' daily calendar of her activities in Illinois. During the search, a woman came to the door asking for "Michael." When one of the officers told the woman that Michael was not there, she asked for Allison. The officer informed her that Allison was not there either, and asked if he could help. The woman said that she had talked to Michael and expected to pick up half of an ounce of methamphetamine and half of an ounce of cocaine on a front. She had customers who were paying cash for the drugs, and she would be back shortly with the money. The officer pretended to weigh out the methamphetamine and cocaine using table salt and gave it to the woman, who was then placed under arrest. The officer also answered telephone calls for "Michael."

In April 1989, Dionne brought a jar of "pickle juice" to Matthews' home and suggested they do a cook together. Dionne left the jar with Matthews, who told Dionne to get in touch with her when he was ready. Two months later, Dionne retrieved the jar from Matthews because Bland wanted it back and had fired shots at him.

In May 1989, Nancy Nietupski asked Matthews to look through her home and remove anything that appeared to be incriminating. Matthews found several microcassettes, one of which contained a recording of a conversation between Thomas Nietupski and Nancy concerning their drug trafficking activities. In the recording, Nancy said she had Taylorville, Hillsboro, and Pana all "sewed up." (Exh. 1C at 11). Thomas was concerned that "the word'll get out," but Nancy replied, "I'm dealing with the dealers." (*Id.*). Thomas also said he would give Nancy $3,000 and pay her expenses to California to find "Marina" to get more drugs. (Exh. 1C at 22). Nancy remarked that her last transaction with Zarnes had been for $14,000, so Zarnes would not want to lose her as a customer. Nancy and Thomas talked about how Zarnes dealt honestly with them, and how high the quality of her product, apparently cocaine, was. Thomas remarked that the "crystal" or methamphetamine was "every bit as good, just perfect." (*Id.*).

In July 1989, federal agents searched Thomas Nietupski's home in Decatur. Among the items seized were books on drug manufacturing; scales; empty capsules; a capsule-filling device; correspondence addressed to Nancy Nietupski and other documents bearing Nancy's name; receipts; and a note in Nancy's handwriting listing names and amounts, including "Nelly" (2,500), "Fred" (4,800), "Cindy" (7,500), and "Poo," Hunter's nickname (1,500). Agents also searched Hunter's home and seized a triple-beam scale; a bottle of inositol powder, which is used to dilute methamphetamine; plastic bags containing methamphetamine residue; Hunter's notes listing money owed and amounts; and several firearms. From Bland's home, the agents seized a copy of Zahm's recipe for methamphetamine, as well as a bottle of hydriodic acid, a chemical used to make methamphetamine.

On July 14, 1989, a federal grand jury returned a two-count indictment against Nancy Nietupski, Thomas Nietupski, Michael Nietupski, Noble, Matthews, Battles, Hunter, Dionne, Bland, and Zarnes. Count One charged each defendant with conspiracy to manufacture and distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged all the defendants, except Thomas, Noble, and Zarnes, with carrying and using firearms during a drug offense in violation of 18 U.S.C. § 924(c).

Matthews pleaded guilty to the conspiracy charge prior to trial. The matter proceeded to trial by a jury. Following the government's case-in-chief, the district court granted Bland's oral motion to bifurcate the remainder of the trial. The jury was permitted to deliberate on Bland's co-defendants' guilt before Bland presented his defense. The jury acquitted Noble but found the eight other defendants guilty on all the counts with which they were charged. The district court sentenced the defendants to the following terms of imprisonment: Nancy Nietupski, 295 months; Thomas Nietupski, 365 months; Michael Nietupski, 387 months; Battles, Hunter, Dionne, and Bland, 181 months; and Zarnes, 120 months. This appeal followed.[1]

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendants Zarnes, Michael Nietupski, Battles, Hunter, Dionne, and Bland challenge the sufficiency of the evidence underlying their conspiracy convictions. Battles, Hunter, Dionne, and Bland were also charged with carrying a firearm in furtherance of the conspiracy in violation of 18 U.S.C. § 924(c). They correctly contend that if the evidence underlying their conspiracy convictions was insufficient, the firearm convictions should also be reversed.

---

1. Nancy Nietupski filed an appeal which this court dismissed by order of March 11, 1994, pursuant to Fed.R.App.P. 42(b). Matthews did not appeal.

"[A] defendant has a heavy burden in challenging the sufficiency of the evidence with regard to his participation in a conspiracy." *United States v. Gutierrez,* 978 F.2d 1463, 1468 (7th Cir.1992). We review the evidence and all the reasonable inferences in the light most favorable to the government, and will reverse a conviction only if no rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. *Id.; United States v. Goines,* 988 F.2d 750, 758 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993).

In evaluating a conspiracy conviction, our review is not limited to direct evidence; circumstantial evidence will be accepted "as support, even sole support, for a conviction." *United States v. Durrive,* 902 F.2d 1221, 1229 (7th Cir.1990). "If the prosecution presents enough circumstantial evidence to support, beyond reasonable doubt, an *inference* that the defendants agreed among themselves to distribute drugs, a jury would be justified in convicting these defendants of conspiring together." *United States v. Burrell,* 963 F.2d 976, 988 (7th Cir.) (quoting *United States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir.1991)), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992). The prosecution must present "substantial evidence that [each] defendant was a conspirator." *United States v. Campbell,* 985 F.2d 341, 345 (7th Cir.1993); *see Durrive,* 902 F.2d at 1228 n. 5. "The evidence need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." *Campbell,* 985 F.2d at 345; *see also Townsend,* 924 F.2d at 1389.

A criminal conspiracy is "an agreement to commit a crime." *United States v. Lechuga,* 994 F.2d 346, 348 (7th Cir.) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). "To join a conspiracy, then, is to join an agreement, rather than a group." *Townsend,* 924 F.2d at 1390. To be a conspirator, the government must prove that the defendant knew of the agreement and that he intended to join and associate himself with its criminal design and purpose. *United States v. Auerbach,*

913 F.2d 407, 414–15 (7th Cir.1990). There must be a "participatory link" between the defendant and the conspiracy. *United States v. Navarez,* 954 F.2d 1375, 1381 (7th Cir. 1992) (quoting *United States v. Missick,* 875 F.2d 1294, 1297 (7th Cir.1989)).

A buyer-seller relationship, standing alone, does not establish the existence of a conspiracy. *Lechuga,* 994 F.2d at 349; *United States v. Blankenship,* 970 F.2d 283, 285 (7th Cir.1992); *Townsend,* 924 F.2d at 1394. This circuit embraces a standard requiring "proof of an agreement to commit a crime other than the crime that consists of the sale itself." *Lechuga,* 994 F.2d at 347. "[T]here must be facts in evidence in addition to a sale for resale from which proof of a conspiracy to distribute can be inferred." *United States v. Baker,* 1 F.3d 596, 597 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 412, 126 L.Ed.2d 359 (1993). Such facts may include transactions in large amounts of drugs, *Lechuga,* 994 F.2d at 347; prolonged cooperation between the parties, *Lechuga,* 994 F.2d at 350; *Townsend,* 924 F.2d at 1395; sales on consignment or on a "front," *Baker,* 1 F.3d at 597; *Blankenship,* 970 F.2d at 287; *Townsend,* 924 F.2d at 1406; and transactions in which the parties have standardized their dealings with one another, *Lechuga,* 994 F.2d at 363–64 (Cudahy, J., concurring in part and dissenting in part), *United States v. Kozinski,* 16 F.3d 795, 808 (7th Cir.1994). Below we discuss the facts that indicate a drug conspiracy between the following defendants:

1. Marina Zarnes

The evidence established that Zarnes played a crucial role in the early stages of the conspiracy as the Nietupskis' dependable supplier of methamphetamine and cocaine. In October 1987, Zarnes' relationship with Zahm led Zahm to act as intermediary in Zarnes' first sale of methamphetamine to Thomas Nietupski and Nancy Nietupski. Once Thomas and Nancy met Zarnes in December 1987, they set about to standardize their future dealings with one another and transacted a second sale. Subsequently, in May 1988, Nancy went to the west coast, presumably to see Zarnes, and

returned with methamphetamine. Telephone records showed that Nancy placed several calls to Zarnes during the month of May. In July 1988, Nancy ventured to California again, this time accompanied by several others, including Matthews, and transacted another deal with Zarnes. Nancy attempted to contact Zarnes in late September 1988, but was unable to find Zarnes, who by this time was in jail. The taped conversation between Thomas and Nancy recorded prior to September 1988 indicated that the relationship between Zarnes and the Nietupskis was a cooperative and mutually beneficial one. Thomas and Nancy talked in glowing terms of their prior drug deals with Zarnes and of Zarnes' honesty. Nancy also spoke of her plan to return to California in search of Zarnes for more business. Nancy indicated that her last transaction with Zarnes involved $14,000, and that she was too good a customer for Zarnes to lose. Zarnes' claims that she knew nothing of the overall conspiracy does not diminish her culpability. A conspirator need not be overly involved with other conspirators, or be aware of the details of the conspiracy, to be held responsible for the acts of the conspiracy. *United States v. Donovan*, 24 F.3d 908, 914 (7th Cir.1994). The evidence of Zarnes' participation in the conspiracy adequately supported her conviction.

### 2. Michael Nietupski

█ The evidence established that Michael Nietupski was intimately involved in the conspiracy. Michael's involvement began in November 1987, when Michael and Nancy Nietupski invested in Kenny and Dusty's unsuccessful methamphetamine laboratory, and when Michael referred Nancy to Hadowsky as a trustworthy drug distributor. Michael's role grew to that of enforcer and resident manager of the Phoenix end of the business, which included both distributing and manufacturing activities. As the enforcer, Michael possessed many guns, including a .357 magnum revolver which he habitually wore at his side during drug transactions, and which the police confiscated in the search of Nauss' apartment. Michael Nietupski displayed this revolver to Matthews when he confronted her with rumors that she was a police infor-

mant. Michael shot at his cousin Bob Blankenship's target range as a warning when Nancy expressed her concern that Bob posed a threat to their continued operations. Michael also shot at Zahm's feet when he confronted Zahm about his ability to manufacture methamphetamine.

With regard to the management of the conspiracy, Michael Nietupski boasted to Hadowsky that the methamphetamine business was his, that he set it up, and that he had access to the "cooker." (Tr. 636). Michael assisted Nancy Nietupski and Zahm in purchasing and transporting laboratory equipment and chemicals, and in setting up a laboratory at the Blankenship farmhouse. Michael later had the laboratory moved to Phoenix where he set Zahm up for several cooks producing varying amounts of methamphetamine which Michael distributed to customers in the area. Michael's distribution activities in Phoenix were documented by Nauss and corroborated by her testimony, as well as the testimony of the police officer who searched Nauss' apartment and of two other witnesses, Steven Phelps and Peggy Griego, who bought methamphetamine from Michael Nietupski in late 1988 and early 1989. The seizure of a booklet on drug manufacturing and a small amount of methamphetamine from Michael's Blazer provided further substantiation. The evidence against Michael, when combined with his filial relationship with Nancy, was more than sufficient to convict Michael of joining the conspiracy. *See United States v. Smith*, 26 F.3d 739, 746–47 (7th Cir.1994) (existence of family relationship combined with other circumstantial evidence may be sufficient to support a conspiracy conviction).

### 3. Benny Battles

█ The government produced abundant evidence demonstrating that Battles was one of Nancy Nietupski's principal distributors of methamphetamine. In Nancy's own words, Battles was "very close," "very special" to her, and was "just as valuable" to her as her main distributor, Cindy Matthews. (Tr. 210, 216–17). Not only did Nancy describe Battles as one of her trusty distributors, but Matthews overheard Battles discuss business

with Nancy, and often spoke to Battles herself, along with Nancy and Hunter, about their shared distribution activities. Nancy also spoke about Battle's role in the business to Zahm, who saw Battles pick up methamphetamine from Nancy after the first cook in October 1988. Battles confided in Zahm that Nancy fronted him on a weekly basis with one-ounce quantities which he sold to Jeffrey Holland and others.

In addition, Battles' dealings with Zahm evidenced Battles' intent to cooperate in the conspiracy and his interest in creating a more cohesive enterprise. For example, Battles had Zahm teach him how to convert methamphetamine from powder to rock form. When Battles lost half an ounce of methamphetamine trying to convert the drug, Zahm gave Battles half of an ounce from his own supply so that Battles could sell it and repay Nancy Nietupski for the last ounce that she had fronted to him. Zahm also bought back an ounce of methamphetamine from William Worker to give to Battles after Battles requested a one-ounce sample for his motorcycle club customers. Finally, Battles was the one who proposed that he and Zahm cook fifty pounds of methamphetamine at one time so Zahm did not have to repeat the process as Zahm had done in the past. All these facts suggested Battles' ongoing relationship with Nancy in the distribution of methamphetamine, and thus Battles' membership in the conspiracy.

### 4. Jeffrey Hunter

■ The evidence established that Hunter was also one of Nancy Nietupski's distributors, a reliable assistant who was "just as valuable" to her as Matthews. (Tr. 210). There was ample testimony that Hunter, like Battles, had an sustained relationship with Nancy, picking up drugs on a front and reselling them to customers. Drug paraphernalia and notes of drug deals seized from Hunter's residence corroborated this testimony, as did Nancy's notes listing the drug debts of "Poo," Hunter's nickname. The evidence also established that Hunter knew about and participated in the manufacturing aspect of the conspiracy. The testimony of Nauss and Zahm indicated that Hunter was

aware of Nancy's attempts to find a laboratory site and of the second gassing of methamphetamine at Neely's farm. The jury was entitled to infer that Hunter agreed with Nancy to distribute methamphetamine.

### 5. Michael Dionne

■ The evidence showed that Dionne was a mid-level distributor in the methamphetamine conspiracy. Nancy Nietupski's main distributor, Matthews, fronted Dionne on a continuing basis with methamphetamine which Dionne distributed to others. Through Matthews, Dionne depended on Nancy for drugs, and Nancy depended on Dionne for payment. In addition, Dionne enjoyed a close and mutually supportive relationship with Zahm. Zahm stayed with Dionne for several days after the first gassing at Neely's farm. Dionne helped Zahm extract methamphetamine from dirty filters, sell drugs to customers, and even bought Zahm a gun. Dionne himself possessed many guns and kept a small arsenal hidden in a closet in his apartment. After Zahm's arrest, Dionne, obviously aware of the manufacturing aspect of the conspiracy and Zahm's role as the cook, engaged Matthews in an abortive attempt to extract methamphetamine from the "pickle juice" that Zahm had left behind. From this evidence a jury could conclude that Dionne shared an interest with the other conspirators in achieving the goal of the conspiracy, the distribution of methamphetamine.

### 6. Marvin Bland

■ Although Bland was a relative latecomer to the conspiracy in comparison to its other members, the evidence that he joined it was no less compelling. Bland developed a collaborative association first with Zahm, and then with Nancy. There was testimony that Bland assisted Zahm in finding a laboratory site, in obtaining chemicals, and in collecting drug debts. The prosecution offered into evidence the methamphetamine recipe that Zahm gave Bland and a bottle of acid used to make methamphetamine. There was testimony that Bland shot at Worker's mailbox as a warning for Zahm to resume his role as Nancy's cook. After Zahm's arrest, Bland

told Matthews that he had some "pickle juice" from Zahm, and that if Matthews arranged for the methamphetamine to be extracted Bland would split it with her.

Bland was also a moving force behind the attempted cook at Lawrence's farm. Bland found the site, helped set up the equipment, and made most of the arrangements with Lawrence, after consulting Nancy Nietupski and Zahm. When Zahm told Thomas Nietupski that he expected to produce seven pounds from the cook, Thomas offered to give both Zahm and Bland one pound each, to which Bland agreed. Once the cook was called off, Bland moved the bulk of the equipment to Matthews' house and stored the remainder at his own home. The record was sufficient to establish Bland's participation in the conspiracy to distribute methamphetamine.

In sum, we conclude that the government presented substantial evidence with which a jury could find beyond a reasonable doubt that the defendants were guilty of conspiring to manufacture and distribute methamphetamine in central Illinois. The sole basis for the defendants' sufficiency challenge to their convictions for using a firearm in the course of a drug trafficking offense was that they did not commit the drug trafficking offenses. Because we have found that there was sufficient evidence to support the convictions for the drug trafficking offenses, we also find that there was sufficient evidence to support the convictions for the firearm offenses. *United States v. Burrell,* 963 F.2d 976, 990 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992).

## B. EVIDENTIARY RULINGS

### 1. Tape recording of Thomas Nietupski and Nancy Nietupski's conversation

 Both Zarnes and Thomas Nietupski challenge the admission of the recorded conversation between Thomas and Nancy Nietupski concerning their drug dealings. Zarnes argues that statements made by Thomas and Nancy in the tape were not

admissible against her as statements of co-conspirators under Fed.R.Evid. 801(d)(2)(E) because the statements were made after she was in jail and had withdrawn from the conspiracy.[2] To withdraw from a conspiracy, a conspirator has to do more than simply cease her activity. *United States v. Patel,* 879 F.2d 292, 294 (7th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990). "[T]here must also be affirmative action, either the making of a clean breast to authorities, or communication of the abandonment in a manner calculated to reach co-conspirators." *Id.* No such action occurred here. Zarnes did not announce to the Nietupskis that she was no longer a member of the conspiracy. Nor did Zarnes make "a clean breast to the authorities." Zarnes' incarceration, by itself, did not establish that she withdrew from the Nietupski ring. *See United States v. Harris,* 542 F.2d 1283, 1301 (7th Cir.1976) ("The arrest or incarceration of a conspirator may constitute a withdrawal for a conspirator, but it does not as a matter of law."), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *see also, e.g., United States v. Puig–Infante,* 19 F.3d 929, 945 (5th Cir.1994); *United States v. Casares–Cardenas,* 14 F.3d 1283, 1288 (8th Cir.1994); *United States v. Gonzalez,* 940 F.2d 1413, 1427 (11th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 910, 116 L.Ed.2d 810 (1992); *United States v. West,* 877 F.2d 281, 289 n. 4 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989). As Zarnes failed to take the necessary steps to withdraw from the conspiracy, Nancy and Thomas's statements made during the course and in furtherance of the conspiracy were admissible as co-conspirator statements under Rule 801(d)(2)(E). *See United States v. Hubbard,* 22 F.3d 1410, 1417 (7th Cir.1994) (co-conspirator statements were properly admissible against a party who remained a conspirator and did not withdraw from the conspiracy); *United States v. Schweihs,* 971 F.2d 1302, 1323–24 (7th Cir.1992) (same). The district court did not err in admitting this evidence.

---

**2.** Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if—[t]he statement is offered against a party and is a statement by a coconspir-

ator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).

■ Thomas Nietupski argues that the tape of the conversation with his ex-wife violated Title III of the Omnibus Crime Control and Safe Street Acts of 1968, 18 U.S.C. § 2510 *et seq.*, and should have been suppressed. Under Title III a person may intercept a telephone call to which he is a party unless the purpose of the interception is to commit a criminal or tortious act in violation of federal or state law. 18 U.S.C. § 2511(2)(d). Thomas contended before the district court that Nancy made the tape in order to blackmail him. Thomas had the burden of proving an unlawful purpose by a preponderance of the evidence. *Traficant v. IRS,* 884 F.2d 258, 266 (6th Cir.1989); *United States v. Phillips,* 540 F.2d 319, 326 (8th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976). After an evidentiary hearing at which Nancy testified, the district court refused to suppress the tape. The court found that Nancy's purpose in taping the conversation was not blackmail, and that her testimony to the contrary was incredible. Nancy admitted that she never used the tape against Thomas or even threatened to do so. The court found that, if anything, Nancy made the tape for the lawful purpose "of turning [it] over to the Government if she were caught in the hope of obtaining a better deal for herself." *United States v. Nietupski,* 731 F.Supp. 881, 883 (C.D.Ill.1990); *see United States v. Dale,* 991 F.2d 819, 841 (D.C.Cir.1992) (per curiam) (taping the telephone call of a confederate in the hope of obtaining evidence to reduce one's sentence is not illegal), *cert. denied,* —— U.S. ——, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993); *see also United States v. Cassiere,* 4 F.3d 1006, 1021 (1st Cir.1993) (district court's factual finding that party made tape recording for lawful purpose of preventing future distortions by a co-conspirator was not clearly erroneous). The district court's factual findings, reflecting its familiarity with the evidence and its determination of witness credibility, were not clearly erroneous. *Anderson v. City of Bessemer City,* 470 U.S.

564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985); *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 673–74 (7th Cir.1993).

2. Zarnes' marijuana and cocaine sale to Thomas Nietupski and Nancy Nietupski

■ Zarnes challenges the admission of Zahm's testimony that in December 1988 she sold marijuana and cocaine to the Nietupskis while they were in California. Zarnes argues that this testimony was irrelevant to the charged conspiracy and used only to show her propensity to deal in drugs. Zarnes cites no rule in support, though ostensibly she relies on Fed.R.Evid. 404(b), which excludes evidence of a defendant's "other bad acts" to prove she committed the offense at issue.[3] *United States v. Soria,* 965 F.2d 436, 442 (7th Cir.1992). As the government asserts, however, the sale testimony was not introduced as a bad act under Rule 404(b), but as direct evidence of Zarnes' involvement in the conspiracy. The sale was an integral part of the first meeting between Zarnes and the Nietupskis. The testimony showed how their relationship began, its basis, and structure, and how the relationship blossomed into the charged conspiracy. *United States v. Diaz,* 994 F.2d 393, 395 (7th Cir.1993). The evidence was "intricately related" to the conspiracy, and, as such, was admissible without regard to Rule 404(b)'s strictures provided that the testimony's potential for unfair prejudice did not substantially outweigh its probative value. Fed.R.Evid. 403; *United States v. Hawkins,* 823 F.2d 1020, 1023 (7th Cir.1987); *United States v. Sophie,* 900 F.2d 1064, 1074 (7th Cir.), *cert. denied,* 498 U.S. 843, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990); *Diaz,* 994 F.2d at 395. Here, the probativeness of Zahm's testimony in showing Zarnes' knowledge of, and participation in, the conspiracy outweighed any prejudicial impact, which arose solely from its tendency to link Zarnes to the conspiracy and was not unfair. *United States v. Hargrove,* 929 F.2d 316, 320 (7th Cir.1991). The district court did not

---

**3.** Rule 404(b) provides, in pertinent part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Fed. R.Evid. 404(b).

abuse its discretion in allowing Zahm to testify concerning the December 1988 marijuana and cocaine sale.

### 3. Methamphetamine seized from Zarnes' trailer

 For the same reasons, Zarnes challenges the admission of methamphetamine seized from her trailer pursuant to her 1988 arrest and conviction for possession of methamphetamine under California law. The indictment alleged a conspiracy beginning in July 1987 and lasting until July 1989. The government introduced evidence that Zarnes was connected to the conspiracy from its inception. Like the evidence of the marijuana and cocaine sale, the seizure of the methamphetamine was directly relevant to the charged conspiracy because it showed that Zarnes possessed the drug she was accused of conspiring to distribute during the time frame of the conspiracy. *See United States v. Wells*, 995 F.2d 189 (11th Cir.1993) (evidence of methamphetamine seized in an unrelated traffic stop was directly relevant to the charged conspiracy to distribute methamphetamine and was not excludable under Rule 404(b)). Because the probative value of this evidence outweighed any prejudicial aspect, its admission was proper.

### 4. Marijuana plants in Hunter's vegetable garden

 Hunter challenges the admission of evidence of marijuana plants growing in his vegetable garden. Hunter's mother, Charlene Hunter, a defense witness, testified that her son "lived a poor life" and had a garden in which he grew food to eat. (Tr. 3331–32). On cross-examination, the government showed Mrs. Hunter photographs of marijuana plants growing in Hunter's garden. Mrs. Hunter testified that she saw only vegetables in the garden and denied seeing any marijuana plants. In rebuttal, an agent from the Drug Enforcement Agency took the stand and testified that while executing a search of Hunter's residence, he found and seized several marijuana plants in the garden. The agent also testified that the photographs accurately depicted part of the marijuana crop seized.

Hunter argues that the evidence of the marijuana plants was inadmissible as a Rule 404(b) bad act. This evidence, however, was not introduced against Hunter but against his mother to rebut her testimony about his garden. Once Mrs. Hunter testified that she did not see marijuana plants, the rebuttal evidence became relevant as impeachment. The evidence was also relevant to refute Mrs. Hunter's testimony that her son was too poor to be a drug dealer, and to show that Mrs. Hunter was trying to protect her son. As we have said previously, "[t]he proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *United States v. Papia*, 560 F.2d 827, 848 (7th Cir.1977). Given the wide discretion afforded the district court in determining the proper scope of rebuttal evidence, we find no error in the admission of the agent's rebuttal testimony against Mrs. Hunter. *Id.* at 848 n. 16; *United States v. Goodwin*, 770 F.2d 631, 638 (7th Cir.1985), *cert. denied*, 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986). Moreover, even if the agent's testimony was admitted against Hunter, the presence of marijuana plants in the garden was consistent with Hunter's defense that he grew marijuana as part of a drug business independent of, and in competition with, the Nietupski operation.

## C. DOUBLE JEOPARDY

 Zarnes argues that the federal prosecution placed her in double jeopardy because she was prosecuted previously for the same conduct in California court. Zarnes' argument, however, ignores the dual sovereignty doctrine, under which two sovereigns may prosecute a person for the "same" conduct if it violates the laws of each. *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 569, 126 L.Ed.2d 468 (1993). California and the federal government are unquestionably separate sovereigns. *Heath v. Alabama*, 474 U.S. 82, 89, 106 S.Ct. 433, 437–38, 88 L.Ed.2d 387 (1985). So, even if Zarnes' conduct underlying both prosecutions was the "same," the Double Jeopardy Clause posed no bar. *See United States v. McKin-*

*ley,* 23 F.3d 181, 184–85 (7th Cir.1994) (collecting cases).

## D. BIFURCATED JURY TRIAL

Bland argues that the district court's bifurcation of the trial violated his Sixth Amendment right to an impartial jury because the jury had already decided the guilt of his co-defendants for the same conspiracy before hearing his case. *See Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Bland relies primarily on the Eleventh Circuit's decision in *United States v. McIver,* 688 F.2d 726 (11th Cir.1982), which also involved a bifurcated trial. In *McIver,* the jury heard the government's case against the three co-defendants, two of the defendants presented their defense, and the jury deliberated, returning a guilty verdict against both defendants. The same jury then heard the third defendant's case and found him guilty as well. In refusing to uphold the bifurcated trial and reversing the third defendant's conviction, the Eleventh Circuit stated:

> A bifurcated trial like the one here and in [*United States v.*] *Stratton* [649 F.2d 1066 (5th Cir.1981) ] violates the Sixth Amendment because the jury might consider, even if inadvertently, the guilt of the defendant before it has heard the defendant's case. Here the three defendants were all charged with the same crimes. The government's evidence presented during the McIvers' phase of the trial pertained to all three defendants. It is unlikely in such a situation that the jury could convict two of the three defendants without forming an opinion regarding the third defendant. Such a jury cannot be impartial; rather, it is 'predisposed to find guilt.' *Stratton, supra,* 649 F.2d at 1082.

688 F.2d at 729 (footnote omitted).

Unlike the present case, the bifurcation procedure in *McIver* was proposed by the district court and implemented over the objection of the third defendant's attorney. *McIver,* 688 F.2d at 728. In this case,

Bland's own lawyer requested that the trial be bifurcated, and Bland himself expressly consented to the bifurcation procedure before the district court.[4] During the government's case-in-chief, it became apparent that Bland intended to call as a defense witness a police officer who would testify that Bland implicated Nancy, Michael Nietupski, Battles, and Hunter in the charged conspiracy. Nancy Nietupski's lawyer was concerned that admitting the officer's testimony would violate the Confrontation Clause if Bland did not testify. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). To meet this concern, Bland's counsel suggested bifurcating the trial:

> MR. NOLL [Bland's attorney]: Based upon a variety of possibilities in this case we could, and we've discussed this with the prosecutor, and I have not discussed this specifically with my client, and that would be a situation, Judge, where basically for some really strong tactical reasons I would like this jury to hear Mr. Bland's defense. I can appreciate we do not want to flirt with a mistrial in this case. We would consider, and at a break talk the prosecution as follows: Number one, all the defendants put on their case. Mr. Bland has an opportunity to cross all their witnesses and so forth. Then we bifurcate the case, allow the jury to go out, make their findings as to all these Defendants. Seal the verdict. The jury comes back, sits down in this courtroom, we present our defense. They go back out, decide Mr. Bland's faith [sic]. Come back, open up the jury's verdicts as to all these Defendants. Open it up as to us. We would bifurcate the findings. Everybody participate. Their guilt or innocence is done and we be allowed to present our defense to the jury, if you will separately, almost as an individual trial.
>
> THE COURT: After the jury has returned a verdict as to the other eight defendants?
>
> MR. NOLL: Yes, sir.

---

4. We note, moreover, that Bland and his counsel were not excluded from any portion of the bifurcated trial; counsel had an opportunity to extensively cross-examine the government's witnesses during the first portion of the trial; and the district court instructed the jury not to consider Bland's guilt in deliberating the guilt of his co-defendants.

THE COURT: Then you present your defense?

MR. NOLL: Yes, sir, and I would sit here as all the other Defendants present their defense, the jury walks out and makes all their findings for eight of the Defendants. I don't know if they found them guilty or not guilty, but I just feel that tactically, and I've discussed this with my client, it is to his advantage to go to trial with these Defendants under these conditions. Tactically that's a decision we have made and that's why he's willing to solve the problem. We bifurcate the case, then all these witnesses wouldn't testify in any way involving these people. They would only testify in my case.

The district court allowed the parties time to consider the procedure suggested by Bland's counsel. Later the same day, the court inquired of the parties' positions regarding the procedure. No one had any objection to bifurcation. The court then personally addressed Bland:

THE COURT: All right, Mr. Bland, you've heard Mr. Risley's [the Assistant United States Attorney] statements and what Mr. Noll advised the Court. He said he talked to you and he talked to you again over the noon hour, and did he indeed?

BLAND: Yes, sir.

THE COURT: And have you discussed this with him?

BLAND: Yes, sir.

THE COURT: Are you ready to tell me on the record whether or not you agree to go along with that?

BLAND: I agree.

THE COURT: So you would like to have everybody else's case determined first and then pick up—

BLAND: Yes, sir.

THE COURT: With the same jury and continue with your defense; is that right?

BLAND: Yes, sir.

THE COURT: All right, fine, thank you very much.

(Tr. 3127).

■ The Sixth Amendment right to an impartial jury, like any constitutional right, may be waived. *See United States v. Cirrincione*, 780 F.2d 620, 624 (7th Cir.1985). A waiver must be knowing and voluntary. *Id.* (quoting *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468–69, 25 L.Ed.2d 747 (1970)). Based on the colloquy between Bland and the district court, it is clear that Bland knowingly and voluntarily waived his claim that the bifurcated trial violated his Sixth Amendment right by personally consenting to the procedure. As counsel acknowledged, moreover, the bifurcation offered Bland a potential tactical advantage, for if the jury found Bland's co-defendants guilty, Bland could conceivably capitalize on that finding to bolster his defense that he was cooperating with the police. *See United States v. Joshi*, 896 F.2d 1303 (11th Cir.) (the defendants waived their Sixth Amendment challenge to trial bifurcation by virtue of their counsel's tactical decision to consent to such a procedure), *cert. denied*, 498 U.S. 986, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990).

### E. COMPETENCY HEARING

Bland argues that the district court should have ordered a second competency hearing *sua sponte* following revocation of his bond. Bland acknowledges that following a hearing in October 1989, he was found competent to stand trial. Nevertheless, Bland contends that evidence presented by the government at the hearing to revoke his bond three months later provided reasonable cause for the court to believe he was mentally incompetent to stand trial. This evidence consisted of the testimony of a probation officer that Bland, while voluntarily admitted to a Veteran's Hospital, misused his anti-anxiety and anti-depressant medication, made threats against his own life and the lives of his wife, son, and half-brother, and destroyed furniture.

■ The district court was required to order a competency hearing *sua sponte* only if there was reasonable cause to believe that Bland was unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. 18 U.S.C. § 4241(a); *United States v. Fuller*, 15 F.3d 646, 649 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2689, 129 L.Ed.2d 820

(1994); *United States v. Collins,* 949 F.2d 921, 924 (7th Cir.1991). "[T]here must be some manifestation, some conduct, on the defendant's part to trigger a reasonable doubt of his competency.... [T]he test is objective, and depends not on what the judge had in mind, but on the facts before him." *Collins,* 949 F.2d at 924 (citation omitted).

■ The district court had no reasonable cause to believe that Bland was incompetent to stand trial when his bond was revoked. First, at the competency hearing, both Bland and his lawyer stated that Bland was mentally competent. The district court was entitled to rely on these statements, as well as the psychiatric/psychological evaluation which determined Bland to be mentally competent. *Collins,* 949 F.2d at 926. Second, Bland offered no evidence that his alleged mental problems were of such a nature that they prevented him from understanding the proceedings against him and interfered with his ability to consult with his attorney. *United States v. Teague,* 956 F.2d 1427, 1432 (7th Cir.1992). Third, Bland failed to point to any questionable conduct at the revocation hearing itself that would lead the court to doubt his competency. *Id.* Bland's limited exchange with the district court during the revocation hearing indicated his awareness of the proceedings. Bland's lawyer made no allegation at the hearing that Bland was unable to assist him. *Id.* On the contrary, the lawyer emphasized the importance of Bland's medication in terms of his ability to assist in his own defense. In these circumstances, the court's failure to order *sua sponte* a second competency hearing was not error.

## F. INEFFECTIVENESS OF TRIAL COUNSEL

■ Bland claims that he was deprived of his Sixth Amendment right to the effective assistance of trial counsel. Ineffective assistance of counsel claims are best brought before the district court by way of a motion for a new trial under Fed.R.Crim.P. 33 or for collateral relief under 28 U.S.C. § 2255. *United States v. Booker,* 981 F.2d 289, 292 (7th Cir.1992). This court will not consider the merits of such a claim raised for the first time on appeal unless, as here, "the

issue is sufficiently clear-cut." *United States v. Limehouse,* 950 F.2d 501, 503 (7th Cir. 1991) (quoting *Johnson v. United States,* 805 F.2d 1284, 1290 (7th Cir.1986)), *cert. denied,* — U.S. —, 112 S.Ct. 1962, 118 L.Ed.2d 563 (1992). A strong presumption exists that counsel gave reasonably professional assistance. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). To overcome this presumption, a defendant must satisfy *Strickland*'s two-prong test by showing that (1) counsel's performance was deficient, and (2) this deficiency made the outcome of his trial fundamentally unfair or unreliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Lockhart v. Fretwell,* — U.S. —, —, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993). Bland failed to pass this test.

■ Bland first contends that counsel was ineffective for proposing a bifurcated trial. As we discussed earlier, counsel's request for bifurcation was a tactical move designed both to obviate a *Bruton* problem and to bolster Bland's theory of defense. The tactic was a reasonable one which Bland himself condoned. *See United States v. Simone,* 931 F.2d 1186, 1195–97 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991). This court will not second-guess trial tactics that are rationally-based. *Booker,* 981 F.2d at 295; *Limehouse,* 950 F.2d at 504; *United States v. Dyer,* 784 F.2d 812, 817 (7th Cir.1986). Thus, we cannot say that counsel's performance fell below "an objective standard of reasonableness." *Strickland,* 466 U.S. at 668, 104 S.Ct. at 2055.

■ Bland next contends that counsel was ineffective for failing to investigate and pursue a diminished capacity defense based on his post-traumatic stress disorder and his misuse of prescription drugs. Here, too, it is obvious that counsel made a strategic choice not to present such a defense. The jury was able to hear evidence of Bland's mental health history through the testimony of his psychiatrist, Dr. Siddique. Counsel also argued this evidence to the jury in his closing statement. "It is not ineffective assistance for counsel to make a tactical decision not to pursue a course of investigation that would produce evidence that counsel otherwise is

aware of or that would add little to otherwise available information." *United States v. Jackson*, 935 F.2d 832, 845 (7th Cir.1991). In all events, Bland has not alleged that counsel's failures prejudiced him.

## G. SENTENCING ISSUES

### 1. Managerial or supervisory role in the offense

▇▇▇▇ Michael Nietupski challenges the adjustment to his offense level based on his role in the conspiracy. The district court increased Michael's offense level by three levels after adopting the finding contained in the presentence report that he was a manager or supervisor of the conspiracy pursuant to U.S.S.G. § 3B1.1(b). *See United States v. Vargas*, 16 F.3d 155, 159 (7th Cir.1994) (district court "may discharge its duty to make factual findings by adopting the findings contained in a presentence report"). Michael did not object to this finding at the sentencing hearing, so he has waived the issue for purposes of this appeal. *United States v. Rivero*, 993 F.2d 620, 623 (7th Cir.1983). We will reverse only if the district court committed plain error. Fed.R.Crim.P. 52(b); *United States v. Olano*, —— U.S. ——, —— –——, 113 S.Ct. 1770, 1176–79, 123 L.Ed.2d 508 (1993); *United States v. Cotts*, 14 F.3d 300, 306 (1994). A plain error is one that "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings." *Olano*, —— U.S. at ——, 113 S.Ct. at 1779 (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

▇▇▇▇ Section 3B1.1(b) of the Sentencing Guidelines provides for a three-level upward departure "[i]f the defendant was a manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Application of this guideline is proper "if the defendant was a manager, i.e., exercised some control over others involved in the criminal scheme, and the scheme involved five or more people." *Goines*, 988 F.2d at 778. In this case, the methamphetamine conspiracy unquestionably involved five or more persons where the indictment itself named ten defendants. *United States*

*v. Johnson*, 997 F.2d 248, 258 (7th Cir.1993). Further, the record shows in several ways that Michael managed the conspiracy. For example, Michael recruited Hadowsky into the conspiracy, orchestrated the relocation of the laboratory from Illinois to Arizona, and acted as an enforcer for the conspiracy, exerting his authority over Matthews and Zahm, among others. Given these facts, the district court's enhancement of Michael's sentence was not plain error.

### 2. Methamphetamine quantities

▇▇▇▇ Michael Nietupski, Battles, Hunter, and Dionne contend that the district court erred in calculating the amount of methamphetamine attributed to each of them for sentencing purposes. Section 1B1.3(a)(1)(B) of the Sentencing Guidelines states that "in the case of jointly undertaken criminal activity . . ., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" are relevant to the determination of a defendant's base offense level. U.S.S.G. § 1B1.3(a)(1)(B). In a drug conspiracy, each conspirator is responsible not only for amounts with which he was directly involved, but also for amounts involved in transactions by co-conspirators that were reasonably foreseeable to him. *Cotts*, 14 F.3d at 305; *Goines*, 988 F.2d at 775. "[R]easonable foreseeability means more than subjective awareness on the part of the individual defendants. . . . Instead, conduct of co-conspirators . . . can be considered 'reasonably foreseeable' to a particular defendant if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct." *United States v. Edwards*, 945 F.2d 1387, 1393–94 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). The district court makes the determination of drug amounts based on the evidence in the case and its own assessments of witness credibility. *Cotts*, 14 F.3d at 305. We review this determination for clear error, and will reverse only if, after reviewing the entire record, we are convinced that a mistake has been committed. *Anderson*, 470

U.S. at 573, 105 S.Ct. at 1511; *Rodgers,* 12 F.3d at 673–74.

■ The district court found that Michael Nietupski was accountable for just over 8.306 kilograms of methamphetamine, the full amount involved in the conspiracy. Michael argues that 67% of this amount was irrelevant to his sentencing calculus because he did not participate in twelve of the seventeen drug transactions cited by the government. Despite Michael's lack of personal involvement in each transaction, the evidence demonstrated that Michael played a key role in the overall conspiracy as enforcer and manager of the Phoenix end of the distribution network. Given Michael's consistent and substantial involvement throughout the life of the Nietupski operation, the district court could properly conclude that the entire amount of methamphetamine distributed in the course of this conspiracy was reasonably foreseeable to Michael. Though the court made no particularized findings regarding the appropriateness of the drug amount, Michael made no objection during sentencing, so any challenge concerning the adequacy of the court's explanation of his sentence was waived. *United States v. Strauser,* 21 F.3d 194, 197 (7th Cir.1994); *United States v. Mojica,* 984 F.2d 1426, 1444 (7th Cir.), *cert. denied,* ⎯ U.S. ⎯, 113 S.Ct. 2433, 124 L.Ed.2d 653; *United States v. Caicedo,* 937 F.2d 1227, 1236 (7th Cir.1991). Waiver aside, Michael did not identify any evidence to support his contention that the full amount of methamphetamine was not reasonably foreseeable to him. *Mojica,* 984 F.2d at 1444 & 1446. The district court did not clearly err in sentencing Michael based on three to less than ten kilograms of methamphetamine.

■ The district court found that Battles and Hunter were each accountable for the distribution of 6.1236 kilograms of methamphetamine from August 1988 until the end of the conspiracy. Battles argues that the district court failed to conduct an individualized inquiry into the amount of drugs reasonably foreseeable to him. Like Michael Nietupski, Battles waived this argument by failing to object to the sufficiency of the court's fact-finding at the sentencing hearing. Even if Battles had preserved this argument, the record reveals that the district court did make particularized findings regarding Battles' role in the conspiracy. The district court found that the evidence established one conspiracy, not multiple conspiracies; that Battles "was a part of [this conspiracy] at the time involved" (Tr. 8); that Battles was "clearly identified as a mid-level distributor for this conspiracy" (Tr. 7); and that the drug amounts which Battles disputed were properly attributed to him because they were "reasonably foreseeable under the conspiracy doctrine." (Tr. 11; *see* Tr. 6–11). In addition, the evidence disclosed that Battles occupied the role of trusted lieutenant in the Nietupski operation. In such capacity, Battles knew about Zahm's manufacturing activities, acted as Nancy's surrogate, and regularly distributed one-eighth to one-quarter pound quantities of methamphetamine per week for Nancy. Thus, Battles' role belied his contention that he could not have reasonably foreseen the flow of 6.1236 kilograms of methamphetamine through the conspiracy.

■ Hunter also argues that the district court failed to specify the reasons for his sentence. Like Michael Nietupski and Battles, Hunter waived this argument because he did not raise it at the sentencing hearing. In any event, the district court's generic explanation of the amount of methamphetamine reasonably foreseeable by Hunter was supported by the collected evidence that placed Hunter in Nancy Nietupski's inner circle. Hunter knew about Nancy's efforts to obtain methamphetamine, her difficulty in finding a lab site, and Zahm's manufacturing activities. This evidence underscored the significance of Hunter's participation in the conspiracy. The district court's finding that Hunter could reasonably have foreseen that the conspiracy he joined involved 6,123.6 grams of methamphetamine was correct.

■ The district court found that Dionne was accountable for the distribution of 7,399.36 grams of methamphetamine. Dionne argues that this finding was inadequate on the same basis advanced by Michael Nietupski, Battles, and Hunter. Again, we reject this argument on account of waiver. The evidence adduced at trial, moreover, es-

tablished Dionne's direct participation in numerous drug transactions. Matthews testified that Dionne was one of her main distributors, and that over a three-month period Matthews fronted Dionne one to two ounces of methamphetamine per week. The evidence also established Dionne's familiarity with the manufacturing aspect of the conspiracy. Dionne helped Zahm extract methamphetamine from filters used in the first "gassing" at Neely's barn. Dionne also suggested to Matthews that they cook the "pickle juice" that Zahm had left behind following his arrest. We conclude that the district court did not err in finding that Dionne was responsible for 7,399.36 grams of methamphetamine.

AFFIRMED.