**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jorge L. DIAZ, also known as "The Mexican," also known as "Ascension Garcia," Defendant–Appellant.**

No. 92–1244.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 16, 1992.

Decided May 28, 1993.

Patrick S. Layng, Asst. U.S. Atty., John P. Collins (argued), Office of the U.S. Atty., Crim. Div., Chicago, IL, for plaintiff-appellee.

Robert A. Novelle (argued), Serpico, Novelle & Navigato, Ken DelValle, Chicago, IL, for defendant-appellant.

Before CUDAHY, EASTERBROOK and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

Undercover agents arrested Gilberto Rios and Rafael Gonzalez for possessing three kilograms of cocaine. The two men told the

---

agents that they were on their way to deliver two-thirds of the cocaine to the appellant in this case, Jorge Diaz. At the agents' request Gonzalez agreed to help the agents snare Diaz. Over the course of the five weeks following his arrest Gonzalez made five phone calls to Diaz that the agents recorded. Each of these conversations tied Diaz in some way to Gonzalez and Rios. The essence of the tapes published to the jury may be summarized in the following way. On the first tape (made on February 6, 1991 at 12:25 p.m.), Gonzalez gave Diaz a fabricated excuse for failing to deliver the two kilograms of cocaine the day before—the day he was arrested. On the second tape (made on February 6 at 7:09 p.m.), Gonzalez told Diaz that he had the cocaine but that it was not of the quality that Diaz wanted. Diaz responded that if he could not get anything better he would take what was available. On the third tape (made on February 15 at 3:41 p.m.), Gonzalez and Diaz talked about Rios's getting arrested. Diaz admonished Gonzalez to be careful. On the fourth tape (made on February 19 at 12:42 p.m.), Gonzalez told Diaz that he was still having trouble getting him cocaine. Diaz told Gonzalez that the delay was acceptable as long as cocaine was still available. On the fifth and final tape (made on March 11 at 4:30 p.m.), Gonzalez and Diaz again talked about Rios. Diaz also said that he was planning to go to Mexico.

Gonzalez also cooperated with the agents by telling them of his dealings with Diaz prior to the arrest. Gonzalez told them about meeting Diaz, about seeing Diaz sell cocaine to others and about buying cocaine from Diaz. He also explained how he had set up with Diaz the cocaine deal that never came to fruition—the deal that the agents broke up by arresting him and Rios.

■ Diaz was indicted as a co-conspirator of Gonzalez and Rios for conspiring to possess with intent to distribute two kilograms of cocaine in violation of 21 U.S.C. § 846. Before his trial Diaz moved to have the five tape-recorded phone conversations with Gonzalez excluded as evidence. Diaz argued that the tapes were made after the conspiracy ended and thus should be excluded as evidence of other bad acts that would prejudice Diaz by showing his propensity for crime bearing on the conduct (the conspiracy) with which he was charged. The court held that the tapes could be admitted at trial because they revealed information "intricately related to the charged crime." The court also ruled that the tapes were evidence of other bad acts admissible under Federal Rule of Evidence 404(b) because they showed intent and knowledge.[1] The court did not regard the evidence as unduly prejudicial under Federal Rule of Evidence 403.

Diaz also moved before trial to bar Gonzalez from testifying about any drug deals that they had completed before the start of the charged conspiracy. Again Diaz argued that those transactions were unrelated to the conspiracy and that the government wanted to use that other crimes evidence to show his propensity to commit the crime with which he was charged. The court admitted the challenged testimony under Rule 404(b) to show knowledge, identity and intent. A jury convicted Diaz of the conspiracy charge, which the government proved primarily through the tapes and Gonzalez's testimony.

Diaz argues on appeal that it was improper for the jury to have heard the tapes or Gonzalez's testimony about Diaz's other bad acts. Diaz contends that the tapes, made after the conspiracy ended, and the testimony, which referred to his conduct before the conspiracy started, were used only to show his propensity to commit the crime charged. These are, of course, arguments that the evidence in question should have been barred because it violated Federal Rule of Evidence 404(b). Diaz, however, mischaracterizes the evidence as evidence of other bad acts; in fact, the evidence introduced here was direct evidence of Diaz's involvement in the conspir-

---

1. Judge Rovner made the initial ruling on the motion involving the tapes. The case was reassigned to Judge Hart, who reconsidered the motion. Judge Hart agreed in the main with Judge Rovner's ruling, but he narrowed the purposes for which the government could use the tapes by rejecting Judge Rovner's decision to let the evidence in for the purpose of showing identity. Judge Hart accordingly redacted the parts of the transcript that his ruling excluded. Only Judge Hart heard and ruled on the motion involving the testimony of Gonzalez.

acy. In similar cases we have said that this kind of evidence is "intricately related" to the occurrence of the charged offense—that is, the taped conversations pertained directly to Diaz's involvement in the conspiracy. *United States v. Hargrove*, 929 F.2d 316, 320 (7th Cir.1991). The tapes included talk of a planned drug deal among the conspirators, talk about the quality of the drugs and talk about the survival of the conspiracy in light of Rios's arrest. These discussions were acts that furthered the goals of the conspiracy; they were not "other bad acts," not directly related to the conspiracy.

We take the same view of Gonzalez's testimony with respect to his preconspiracy cocaine deals with Diaz. The facts of those deals showed that the charged conspiracy existed by showing how the conspiratorial relationship between Gonzalez and Diaz developed. This testimony established how the conspirators came to know each other, how they established a relationship of trust through their associations and how these events flowered into the charged conspiracy. These acts were direct evidence of the conspiracy.

■ When dealing with direct evidence of the conspiracy as we are here, Rule 404(b) never comes into play. Rule 403, however, still protects Diaz against the admission of evidence that is unduly prejudicial. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir.1990). In light of the balancing of probativeness against prejudice required by Rule 403, the district court did not abuse its discretion in admitting the tapes and the testimony. *United States v. Whalen*, 940 F.2d 1027, 1032 (7th Cir.1991). The direct relevance of the tapes is clear. Believing the conspiracy to be ongoing Diaz continued to act as a conspirator, as the tapes disclose. Diaz argues that, despite the relevance of the evidence, it unduly prejudiced him because without the tapes the government had a weak case. But this contention goes more to the probativeness of the tapes than to any "prejudice" connected with them.[2] The court did not abuse its discretion by admitting the

tapes as evidence against Diaz. The similar argument with respect to Gonzalez's testimony fails for the same reason. Diaz was dealing drugs at a time shortly before the initial date of the charged conspiracy and involving the same kind of drugs as the conspiracy. The district court did not abuse its discretion by allowing Gonzalez to testify about how Diaz's drug dealing prior to the conspiracy led to the conspiracy.

AFFIRMED.

---

2. Even if the tapes were considered to be "other acts" evidence, the jury was twice instructed to consider them only for the limited purpose of

determining whether Diaz had the intent to participate in the conspiracy.