In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-2657 & 98-2812

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ROBERT DANIEL WARD and RODNEY ELLIS,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 CR 730--Charles P. Kocoras, Judge.

Argued October 27, 1999--Decided April 28, 2000

Before HARLINGTON WOOD, JR., FLAUM, and EVANS, Circuit
Judges.

HARLINGTON WOOD, JR., Circuit Judge.  On June 16,
1997, a multi-count second superseding indictment
was filed in the Northern District of Illinois
charging Robert Daniel Ward and Rodney Ellis,
along with nine codefendants, for conduct
relating to a large-scale drug distribution
conspiracy. The tremendously successful
conspiracy was organized and supervised by Nathan
"Nate" Hill who began distributing cocaine in the
Chicago area in the late 1980s. Ward and Ellis
were each convicted on two counts of the
indictment following a jury trial. On appeal,
Ward raises several challenges to his conviction.
Ellis also appeals, challenging his sentence.

I.  BACKGROUND

  The Hill conspiracy distributed thousands of
kilograms of cocaine in the Chicago area between
1987 and December 1995. Hill obtained this
cocaine from a variety of suppliers. Ward, who
was based in Los Angeles, California, was one of
Hill's large-scale suppliers. Ward employed a
number of couriers, some of whom were supervised
by Donald Marini and Cameron Wright, to transport
large quantities of cocaine from California to
Chicago. Hill then acted as a wholesaler, selling
multi-kilogram quantities of cocaine to

distributors in the Chicago area. After several of his couriers were arrested, Ward began chartering Lear jets to transport cocaine to Chicago. Between March 1, 1994 and October 7, 1994, for example, Ward chartered eight trips to Chicago through Sussex Aviation in Van Nuys, California. Testimony was presented at trial that each charter trip involved the transportation of approximately fifty kilograms of cocaine.

Drug trafficking provided Hill with sizable profits which he used to purchase homes, cars, boats, and, eventually, a four-engine JetStar aircraft. Hill also sought legitimate business opportunities through which he could launder his drug proceeds. One of these businesses was Pocketown Records, a record producing and manufacturing business formed in 1993 by Nate Hill and Michael Jefferson. At Hill's direction, Rodney Ellis, a cousin to Hill, participated in the operation of Pocketown Records. Ellis managed Pocketown's daily operations and financial activities. Pocketown's expenses were paid primarily in cash. For example, no salary checks were issued; instead Hill handed out cash payments to Pocketown workers. On several occasions, Ellis transported large amounts of cash from Chicago to Pocketown, which was located in New York, and at other times, Ellis received deliveries of cash from other Hill employees. Ellis prepared false records for Pocketown in an attempt to justify the influx of cash to the business. Ellis also provided inaccurate information to the accountant who was preparing Pocketown's 1993 tax returns. Ellis then signed the falsified return and filed it with the IRS. Ellis later became involved in another of Hill's business ventures, the production of a motion picture entitled "Reasons" which was based on Hill's life story. Ellis played a limited role in the "Reasons" production, unsuccessfully attempting to persuade a recording company to produce the soundtrack for the film.

The initial indictment in the case was filed on December 13, 1995. It contained eighteen counts and named twenty-one defendants. A superseding indictment was filed on October 31, 1996, and on June 16, 1997, a second, and final, superseding indictment was filed. Ward was charged under Counts One and Four of the second superseding indictment. Count One alleged that Ward was involved in a conspiracy to distribute and to possess with intent to distribute mixtures containing cocaine in violation of 21 U.S.C. sec. 846. Count Four charged Ward with a violation of 21 U.S.C. sec. 841(a)(1) based on an alleged attempted distribution of approximately nine kilograms of cocaine on or about January 21, 1993. Ellis was charged in Counts Seven and Eight

of the second superseding indictment. Count Seven charged Ellis together with several codefendants with conspiracy to defraud the United States, in particular the Internal Revenue Service, in violation of 18 U.S.C. sec. 371, while Count Eight charged Ellis and several codefendants with money laundering in violation of 18 U.S.C. sec. 1956(h). The case proceeded to a jury trial, and both Ward and Ellis were convicted on each of the counts against them. Ward was sentenced to 360 months imprisonment on each count with the sentences to run concurrently. Ellis was sentenced to 108 months imprisonment. A timely notice of appeal was filed in each case, and the cases have been consolidated for appeal.

## II.  ANALYSIS

Ward raises several challenges to his conviction, while Ellis challenges the district court's computation of his sentence. We address each appellant's argument in turn.

### A.  Robert Daniel Ward

Ward challenges the district court's rulings on his speedy trial motion and on several evidentiary motions. Ward further asserts that the district court erroneously limited the scope of his cross-examination of Donald Marini and erred in failing to sua sponte recuse itself. Finally, Ward contends that the government committed prejudicial error based on a comment made during closing argument.

#### 1.  Speedy Trial Motion

Ward was arrested in Los Angeles, California on January 11, 1996 on charges stemming from a false application for a passport. While Ward was in custody on the passport charges, he was separately indicted in the Central District of California for narcotics violations based on his distribution of drugs to the Hill conspiracy. On October 11, 1996, a criminal complaint was filed in the Northern District of Illinois charging Ward with narcotics violations in connection with the Hill conspiracy. On October 18, 1996, the narcotics charges pending against Ward in the Central District of California were dismissed after prosecutors received the Illinois complaint and an accompanying bench warrant for Ward's arrest.

On October 21, 1996, Ward was sentenced to probation on the passport case. Ward, however, remained in custody in California based on the Illinois complaint and warrant. During November

and December 1996, the United States Marshals Service for the Northern District of Illinois attempted to obtain custody of Ward through its normal channels. These attempts were complicated due to erroneous information received from the Marshals Service Prisoner Coordination Section that Ward could not be transported to Chicago because there were still charges pending against him in California. On January 7, 1997, Ward was brought before a magistrate judge in the Central District of California for an out-of-district process hearing at which time Ward asserted his speedy trial concerns. The magistrate noted Ward's objections and stated that Ward would need to raise them in the Northern District of Illinois following his transfer. On February 11, 1997, the Marshals Service in the Northern District of Illinois was informed that Ward was being held in California pending the results of his tuberculosis test./1 Ward was cleared for transportation to Chicago on approximately February 26, 1997. He arrived in the Northern District of Illinois on either March 6 or 7 and made his first appearance before a judicial officer on March 13, 1997. On March 27, 1997, Ward filed a motion to dismiss the indictment, arguing that the delay from the time his California charges were resolved until he was brought before a judicial officer in the Northern District of Illinois violated his right to a speedy trial under the Speedy Trial Act, 18 U.S.C. sec. 3161 et seq., the Sixth Amendment, and Federal Rule of Criminal Procedure 48(b). The district court denied Ward's motion. Ward's jury trial began on November 6, 1997.

By its express terms, the Speedy Trial Act does not apply in the present case. Under the Act, the trial of an accused must commence "within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. sec. 3161(c)(1). Ward challenges only the delay from the time charges were filed in the Northern District of Illinois until March 13, 1997, the day he first appeared before a judicial officer in the Northern District of Illinois. This time period is outside of the Speedy Trial Act, and because Ward does not allege any improper delay during the time his Speedy Trial Act clock was running, his Speedy Trial Act claim fails.

The Sixth Amendment right to a speedy trial is similar to, but separate from, the right created by the Speedy Trial Act. United States v. Koller, 956 F.2d 1408, 1413 (7th Cir. 1992). The Supreme Court has established a four-factor balancing test to use in determining whether a defendant's

Sixth Amendment right to a speedy trial has been violated. See Doggett v. United States, 505 U.S. 647, 651 (1992); Barker v. Wingo, 407 U.S. 514, 530-33 (1972). Under this test, we must consider "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." Doggett, 505 U.S. at 651.

In determining whether the delay was uncommonly long, we must consider the interval between accusation and trial, here over a year. See Doggett, 505 U.S. at 651. As the Supreme Court noted in Doggett, courts have generally found delays approaching one year to be presumptively prejudicial. Id. at 652 n.1. However, Ward challenges only the period between the return of the indictment and his first appearance in the Northern District of Illinois. Therefore, this factor does not weigh heavily toward either side. With respect to the second factor, Ward alleges that the delay was the result of a lack of diligence on the part of the prosecution. An examination of the record reveals that the delay resulted from miscommunication and the necessity of fulfilling certain prerequisites to transfer. Because this equates at the most to negligence on the part of the government, this factor must "'be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.'" United States v. Jackson, 542 F.2d 403, 407 (7th Cir. 1976) (quoting Barker, 407 U.S. at 531); see also Doggett, 505 U.S. at 657 ("To be sure, to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice.").

Ward contends that he fulfilled the third prong by asserting his speedy trial concerns immediately upon being brought before the magistrate in California for his out-of-district proceedings and by reasserting these concerns at his initial appearance in the Northern District of Illinois. However, Ward asserted his right to a speedy trial after much of the alleged improper delay had occurred. See United States v. Deleon, 710 F.2d 1218, 1222 (7th Cir. 1983). Ward knew of the charges against him and was represented by counsel from the time the California charges were resolved, yet he did nothing to assert his speedy trial right until his out-of-district process hearing. This factor does not weigh strongly in Ward's favor. Finally, with respect to the prejudice prong, Ward does not allege that the

delay impaired his ability to present his defense. Instead, Ward "asserts that the stress and anxiety of being incarcerated and awaiting transportation to Chicago following the conclusion of the California cases in October 1996, were oppressive and increased the anxiety and concern on his behalf." While this is a proper factor to consider under the prejudice prong, it is insufficient to tip the scales in Ward's favor. See Jackson, 542 F.2d at 409 (stating that general allegations of anxiety and concern constitute only minimal prejudice, especially when unenhanced by an impairment in presenting a defense). Weighing the four factors, we find that Ward's Sixth Amendment right to a speedy trial was not violated.

We review the district court's denial of Ward's Federal Rule of Criminal Procedure 48(b) claim for abuse of discretion. Deleon, 710 F.2d at 1223. Under Rule 48(b), "if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint." Fed. R. Crim. P. 48(b). Rule 48 "is not circumscribed by the Sixth Amendment," Deleon, 710 F.2d at 1223; however, as the Eighth Circuit has recognized, it is driven "by the same general considerations as the Sixth Amendment." United States v. DeLuna, 763 F.2d 897, 923 (8th Cir. 1985). Incorporating our analysis above and noting that there was no evidence of purposeful delay by the prosecution, we find that the district court did not abuse its discretion in denying Ward's motion to dismiss the indictment pursuant to Rule 48(b). See, e.g., United States v. Sears, Roebuck & Co., Inc., 877 F.2d 734, 739 (9th Cir. 1989) ("In general dismissal under Rule 48(b) is appropriate only where there is delay that is purposeful or oppressive." (internal quotations and citations omitted)).

2. Evidentiary Issues

Ward first challenges the district court's admission of testimony from two witnesses who were cooperating with the government, Donald Marini and Cameron Wright, regarding drug involvement with Ward prior to the charged conspiracy. Marini testified that he began selling and transporting drugs for Ward in approximately 1987 and continued to do so until he was arrested in 1993. Wright testified that he began purchasing cocaine from Ward when Wright was still in college and continued to purchase cocaine from Ward after his graduation from college in 1991. Eventually, Marini became a courier between Ward and the Hill operation in Chicago, and both Marini and Wright supervised couriers for Ward in connection with the Hill

conspiracy. Ward objected to the testimony regarding prior drug transactions between himself and Marini and Ward. The district court overruled Ward's objection, finding an inextricable link between the testimony and the charged offenses and stating that the testimony about prior drug relationships was "highly relevant and probative." Ward argues that this ruling was erroneous under Rules 403 and 404(b) of the Federal Rules of Evidence./2 We review for abuse of discretion. United States v. Akinrinade, 61 F.3d 1279, 1283 (7th Cir. 1995).

Evidence of uncharged criminal activity is admissible if it is "'intricately related to the facts of the case' before the court." United States v. Ramirez, 45 F.3d 1096, 1102 (7th Cir. 1995) (quoting United States v. Hargrove, 929 F.2d 316, 320 (7th Cir. 1991)). The admissibility of such evidence is limited only by Rule 403 and is not subject to the limiting requirements of Rule 404(b). Id. at 1102-03. In the present case, the testimony of Marini and Wright was intricately related to the charged conspiracy because it showed how the men's relationship with Ward "began, its basis, and structure, and how the relationship blossomed into the charged conspiracy." United States v. Zarnes, 33 F.3d 1454, 1469 (7th Cir. 1994) (citing United States v. Diaz, 994 F.2d 393, 395 (7th Cir. 1993)). While it was not disputed that Ward knew Marini and Wright, the testimony regarding the prior drug transactions was integral to the complete story of the charged conspiracy in that it outlined the development of the relationship of trust between the men which led to their respective roles in the conspiracy. See Diaz, 994 F.2d at 395. Additionally, to further minimize the risk of unfair prejudice, the court gave limiting instructions during the testimony of both Marini and Wright, instructing the jury to consider the information regarding the prior activities only as background and with respect to the relationship which existed between the parties. It is clear that the probative value of the testimony outweighed any potential for unfair prejudice. Therefore, the testimony was properly admitted "without regard to Rule 404(b)'s strictures," Zarnes, 33 F.3d at 1469, and the district court did not abuse its discretion in allowing it.

Ward next argues that the district court erred in allowing evidence regarding Ward's use of false identification in the name of Jeffery Eugene Palmer. Our review is for abuse of discretion. United States v. Aldaco, 201 F.3d 979, 985 (7th Cir. 2000). While Ward contends that the district court failed to meet the requirements for admissibility under Fed. R.

Evid. 404(b), the evidence was not offered under Rule 404(b) but rather as direct evidence to support the government's allegations that Ward furthered the conspiracy by using aliases. Evidence was presented at trial that, on March 10, 1995, coconspirator William "Ikey" Hill was identified driving a black van registered to a Jeffery E. Palmer. Therefore, the false identification evidence was probative in that it showed a link between Ward and members of the Hill conspiracy. Furthermore, the district court limited the information that was admitted to reduce the risk of unfair prejudice to Ward. The jury was told only that Ward attempted to obtain a passport in the name of Jeffery Eugene Palmer and was not informed that Ward was arrested for this incident. Under these circumstances, the probative value of the false identification evidence outweighs any risk of unfair prejudice. The district court did not abuse its discretion in admitting the evidence, and Ward's claim fails./3

3.   Cross-Examination of Donald Marini

Ward asserts that the district court improperly restricted his defense by limiting the scope of his cross-examination of government witness Donald Marini. On cross-examination by Ward's counsel, Marini testified that, as a result of his cooperation, federal prosecutors helped to clear a warrant against Marini based on unrelated charges in California state court. Defense counsel then sought to question Marini as to the nature of the state charges, attempting to elicit the fact that the charges were based on allegations of spousal and child abuse. The prosecutor objected, and following a sidebar, the court sustained the objection. The court noted that the information regarding the nature of the charges was highly inflammatory and irrelevant to the point being developed on cross-examination that Marini received a benefit for his cooperation. We review a district court ruling limiting cross-examination for abuse of discretion. Akinrinade, 61 F.3d at 1285.

As we have noted, "the sufficiency of cross-examination turns on whether the jury had sufficient information to make a discriminating appraisal of the witness' motive and bias." Akinrinade, 61 F.3d at 1285 (internal quotations and citations omitted). Ward argues that the district court's ruling prevented him from inquiring "as to the substantial benefit to Mr. Marini as bearing on bias, motive and credibility." However, the district court allowed Ward's counsel to elicit the fact that Marini received a benefit in the form of dismissal of a

state warrant in exchange for his cooperation in the federal prosecution. This was sufficient to allow the jury to make a discriminating appraisal of Marini's motive and bias. Moreover, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). The district court did not abuse its discretion in prohibiting defense counsel from inquiring into the nature of the state charges.

## 4. Recusal

Following Ward's conviction but prior to sentencing, defense counsel became aware, through our opinion in In re Hatcher, 150 F.3d 631 (7th Cir. 1998), that Judge Kocoras's son, John Kocoras, while acting as a third-year law student intern in the United States Attorney's Office for the Northern District of Illinois, had assisted in the trial of Gangster Disciple leader Larry Hoover. Acting under the authority of Northern District of Illinois General Rule 3.11, John Kocoras presented eight government witnesses during the Hoover trial. Judge Kocoras attended the trial to observe his son's performance. One of the witnesses presented by John Kocoras testified regarding the seizure of $364,000 from William Hill and a member of the Gangster Disciple street gang. Testimony regarding this seizure was presented at Ward's trial as well. This was the only overlap between evidence presented at the Hoover trial and that presented at Ward's trial.

Ward was convicted on December 19, 1997. Our Hatcher opinion was issued on May 13, 1998. Based on the information revealed in Hatcher, Ward moved for Judge Kocoras's recusal at his sentencing hearing on June 18, 1998. Judge Kocoras denied the motion. On appeal, Ward argues that Judge Kocoras's presence at the Hoover trial and his son's involvement in Hoover's prosecution created a conflict that required recusal or, at the very least, disclosure.

Ward bases his argument in part on 28 U.S.C. sec. 455(a) which requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The government argues that Ward waived his sec. 455(a) claim by failing to pursue it prior to trial, citing United States v. Troxell, 887 F.2d 830, 833 (7th Cir. 1989), United States v. Bonds,

847 F.2d 1233, 1241 (7th Cir. 1988), and United States v. Balistrieri, 779 F.2d 1191, 1204-05 (7th Cir. 1985). The application of these cases to the present situation is debatable because, given the sequence of events outlined above, it is clear that Ward did not discover the information upon which he based his motion for recusal until after his trial was concluded. In the present case, we need not decide the waiver issue because Ward's claim fails on its merits. Recusal is required under sec. 455(a) when a "judge's impartiality could be questioned by a reasonable, well-informed observer." Hatcher, 150 F.3d at 637 (citation omitted). The single evidentiary overlap between Ward's case and the Hoover prosecution is insufficient to support even an appearance of impropriety. Ward's case is easily distinguishable from Hatcher, in which both cases were part of one large prosecution of a continuing criminal enterprise and involved "virtually the same offenses, committed by the same people." Id. at 638. The connection between Ward's case and the Hoover prosecution was not significant enough to require recusal under sec. 455(a). To the extent that Ward asserts claims under 28 U.S.C. sec. 455(b)(1) and (b)(5), these arguments were fully addressed and rejected in Hatcher, id. at 635-37, and we will not reexamine them here. Recusal was not required.

5.  Closing Argument

Ward asserts that the prosecution committed reversible misconduct based on an alleged improper comment during its rebuttal closing argument. The comment at issue dealt with several photographs that law enforcement agents recovered from Ward when he was arrested on the passport charges. The photographs, which were presented at trial, were from Ward's wedding and included shots of Donald Marini and Cameron Wright. When they were seized from Ward, the photos were cut or folded in such a way as to highlight Marini and Wright, both of whom Ward knew were cooperating with the government by this time.

The prosecutor did not mention the photographs in his initial closing argument. In his closing argument, defense counsel addressed the photos, calling them a "non-issue" and arguing that the photos only went to show the conceded fact that Ward, Wright, and Marini knew one another. A second Assistant United States' Attorney presented the government's rebuttal argument. In response to defense counsel's proffered explanation for the photos, she stated

The photos that he [Ward] has with him, when he's attempting to leave the country, apparently,

Cameron Wright, Donald Marini, wedding pictures [sic].

   [Defense counsel] would say, okay, it shows what good friends they are. Ladies and gentlemen, I believe that you could draw from this an inference it's something slightly more sinister.

   This man, he knows without a doubt--Robert Daniel Ward knows that this man is cooperating against him as of January of 1996. He knows that this man in the back seat of that car is cooperating against him in 1996. For the family album? I don't think so, and I don't think the evidence indicates that.

Defense counsel objected, targeting his objection to "any sinister inference" and stating that there was no evidence to support the prosecutor's line of argument. The court responded, "Well, she may argue and the jury may accept or reject any inferences to be drawn. She may argue." Ward raised the issue of prosecutorial misconduct again in a motion for a new trial, which the district court denied. We review both the overruling of Ward's objection and the denial of the motion for a new trial for abuse of discretion. United States v. Knox, 68 F.3d 990, 1000 (7th Cir. 1995).

   Our analysis to assess allegations of prosecutorial misconduct during closing argument is two-fold. United States v. Butler, 71 F.3d 243, 254 (7th Cir. 1995). The first step is to examine the disputed comment in isolation to determine whether it was in fact improper. Id. If the comment was improper, we must then examine the comment in light of the record as a whole to determine whether the defendant was deprived of a fair trial. Id. As the district court recognized, in closing argument, a prosecutor "may argue reasonable inferences from the evidence that the jury has seen and heard." United States v. Waldemer, 50 F.3d 1379, 1383 (7th Cir. 1995). While "innumerable factors may figure in the reasonableness calculation," the most obvious considerations are "[w]hether the evidence bears logical and proximate connection to the point the prosecutor wishes to prove." Id. at 1384. It is also important to consider whether the prosecutor made "the argument solely to inflame the passions of the jury." Id. Given the circumstances of the present case, the argument was logically and proximately connected to the evidence. Moreover, the argument was not made solely to inflame the jury but rather in response to an explanation offered by defense counsel in his closing argument. The prosecutor's argument was not so unreasonable as to deprive Ward of a fair trial. See id. at 1385. Ward's prosecutorial

misconduct claim fails.


  B.  Rodney Ellis


  Ellis raises several challenges to the district
court's determination of his sentence. Ellis
first contends that the district court erred in
its application of sec. 2S1.1(b) of the United
States Sentencing Guidelines ("the Guidelines").
Ellis further asserts that the district court
abused its discretion by sentencing him at the
high end of his Guidelines range.


  Ellis's sec. 2S1.1(b) argument is two-fold.
First, Ellis argues that the district court's
decision to apply both subsection (1) and
subsection (2) of sec. 2S1.1(b) resulted in
impermissible double counting, citing United
States v. Atterson, 926 F.2d 649, 660 (7th Cir.
1991). The present case, however, is
distinguishable from Atterson. The district judge
did not base Ellis's sec. 2S1.1(b)(2) enhancement
on the street value of the quantity of drugs
involved in the conspiracy, but rather on actual
instances of money laundering. See United States
v. House, 110 F.3d 1281, 1285 n.3 (7th Cir. 1997)
(distinguishing Atterson). There is no
impermissible double enhancement.


  Alternatively, Ellis contends that the district
court's finding under sec. 2S1.1(b)(2) that the
value of funds laundered exceeded $2 million was
unsupported by the evidence./4 The district
court arrived at this value by holding Ellis
responsible for (1) $750,000 to $1 million
laundered through Pocketown in 1993; (2) $1.5
million laundered into the JetStar aircraft, a
seventy-two foot yacht, and a speed boat which
accompanied the yacht; and (3) $1,107,000
laundered through "Reasons." At sentencing, Ellis
challenged the inclusion of the amounts relating
to the plane, the yacht and speed boat, and
"Reasons." On appeal, Ellis challenges only the
district court's valuation of Hill's investment
in Pocketown and the inclusion of amounts
relating to the yacht and accompanying speed
boat.


  As previously noted, Ellis did not object to
the valuation of the Pocketown investment at
sentencing. Therefore, our review with respect to
this issue is for plain error. United States v.
Monem, 120 F.3d 645, 647 (7th Cir. 1997). At
sentencing, the district court adopted the
$750,000 to $1 million value for the Pocketown
investment. This value is supported by Michael
Jefferson's trial testimony and by the
calculations set out in the presentence report.
There is no plain error, and we turn to the

inclusion of the value of the yacht and speed boat. Because Ellis objected to this inclusion at sentencing, we review for clear error. United States v. Gwiazdzinski, 141 F.3d 784, 788 (7th Cir. 1998). Under this standard, we will reverse "only if the district court's findings are without foundation in the evidence, such that we are 'left with the definite and firm conviction that a mistake has been committed.'" House, 110 F.3d at 1283 (quoting United States v. Herrera, 54 F.3d 348, 356 (7th Cir. 1995)). Under U.S.S.G. sec. 1B1.3(a)(1)(B), Ellis is liable for funds laundered by his coconspirators as long as the acts were reasonably foreseeable. Ellis argues that there was no evidence that he ever used or even knew of the yacht; however, the trial testimony of Elisha Tapes supports a finding that Ellis at the very least had knowledge of the yacht. Tapes described a trip to Houston, Texas which included Tapes, Nate Hill, Hill's mother, and Ellis, among others. The group flew to Texas on Hill's JetStar aircraft. During the flight, Hill boasted that he owned the plane and was proud of it. Tapes further testified that, at one point during the Houston trip, Ellis was present during a conversation in which Nate Hill, together with the man who arranged the yacht's purchase, were describing and bragging about it. The district court's inclusion of the value of the yacht and its accompanying speed boat in its sec. 2S1.1(b)(2) calculation was not clearly erroneous.

Ellis's remaining challenge to his sentence is also unpersuasive. Ellis contends that the district court abused its discretion by sentencing him at the high end of his Guidelines range, arguing that the district court's stated reasons for imposing a sentence at the top of the Guidelines range were contradictory and, therefore, inadequate under 18 U.S.C. sec. 3553(c). A review of the transcript of the sentencing hearing reveals that the district court provided a detailed and internally consistent explanation to justify its decision. The court recognized that Ellis was not required to confess, but stated that a sentence at the high end of the Guidelines range was appropriate because Ellis failed to show "one ounce of remorse, one ounce of acceptance of responsibility, one ounce of some sort of understanding of why you are here and what you did[,] . . . one ounce of humanity, [or] one ounce of recognition." The court informed Ellis that "it would have been nice at some point for you, in whatever oblique way you wanted to do it, to recognize that society was harmed by your activity." The district judge further noted that despite Ellis's insistence that some of the witnesses lied, he thought the evidence against

Ellis was "overwhelming." This explanation is both proper and sufficient to satisfy 18 U.S.C. sec. 3553(c). Therefore, as Ellis's sentence was imposed pursuant to the law and within the applicable Guidelines range, we lack jurisdiction to review the district court's placement of the sentence within the range. See United States v. Solis, 923 F.2d 548, 551 (7th Cir. 1991). Ellis's sentencing challenges fail.

III.  CONCLUSION

   Ward's conviction is affirmed. Ellis's sentence is affirmed.

/1 Marshals Service regulations will not allow for the transportation of a prisoner unless the prisoner has tested negative for tuberculosis.

/2 Fed. R. Evid. 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Under Fed. R. Evid. 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity, or absence of mistake or accident."

/3 Although counsel for Ward attempted to challenge additional evidentiary rulings at oral argument, these issues were not raised in his brief and are waived. United States v. Magana, 118 F.3d 1173, 1198 n.15 (7th Cir. 1997).

/4 This finding resulted in a six-point enhancement in Ellis's base offense level under sec. 2S1.1(b)(2).