**UNITED STATES of America,
Plaintiff,**

v.

**Shawn Eugene WIMBERLY,
Defendant.**

No. CR. 93–50028.

United States District Court,
E.D. Michigan,
Southern Division.

March 13, 2003.

Mark C. Jones, U.S. Attorney's Office, Flint, MI, for U.S. Attorneys.

Ralph H. Richardson, Stone & Richardson, Detroit, MI, for Shawn Eugene Wimberly, defendant.

## MEMORANDUM OPINION AND ORDER

GADOLA, District Judge.

Before the Court is Defendant's motion to dismiss the indictment [docket entry 497]. The Court held an evidentiary hearing in this matter on February 27, 2003. For the reasons set forth below, the Court shall deny Defendant's motion.

## I. BACKGROUND

### A. PROCEDURAL BACKGROUND

On April 30, 1993, a federal grand jury returned a twelve count superseding indictment against Defendant and three co-defendants. Defendant was charged in three counts: *Count One*—Conspiracy to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846; *Count Eleven*—Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a)(1); and *Count Twelve:* Distribution of Cocaine in violation of 21 U.S.C. § 841(a)(1). A warrant for Defendant's arrest also was issued on April 30, 1993.

The grand jury returned a second superseding indictment on June 25, 1993, and a third superseding indictment on November 5, 1993. Defendant was charged in the third superseding indictment with: *Count Two*—Conspiracy to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846; *Count Twelve*—Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a)(1); and *Count Thirteen*—Distribution of Cocaine in violation of 21 U.S.C. § 841(a)(1) and Aiding and Abetting in violation of 18 U.S.C. § 2.

Defendant was arrested on September 3, 2002, in Phoenix, Arizona and made an initial appearance in this Court on October 4, 2002, before United States Magistrate Judge Wallace Capel, Jr. On November 8, 2002, Defendant filed the present motion to dismiss the indictment. Defendant asserts that the delay of over nine years between his indictment and arrest violated his right to a speedy trial under the Sixth Amendment, Rule 48(b) of the Federal Rules of Criminal Procedure, and the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*

### B. FINDINGS OF FACT

As noted above, the Court conducted an evidentiary hearing in this matter on February 27, 2003. Defendant produced one witness, his mother, Betty Wimberly. The Government produced two witnesses, Agents Greg Stejskal and John Cecil, both of the Federal Bureau of Investigation ("FBI"). Both parties introduced docu-

mentary exhibits into evidence as well.[1] Having now considered all of the evidence submitted, the Court sets forth its findings of fact pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure.

On February 17, 1993, Defendant was stopped by a City of Westland, Michigan police officer for a traffic violation. (*See* Gov. Ex. 5.) (Tr. 81–82.) Defendant provided the officer with his driver's license, and the officer conducted a LIEN check. (*See* Gov. Ex. 5.) (Tr. 81–82.) After discovering an outstanding warrant, the officer requested that Defendant step out of his vehicle. (*See* Gov. Ex. 5.) (Tr. 81–82.) At that point, Defendant fled the scene in his vehicle. (*See* Gov. Ex. 5.) (Tr. 81–82.) As Defendant was fleeing, the officer reported observing Defendant toss a package out the window of his vehicle. (*See* Gov. Ex. 5.) (Tr. 81–82.) Subsequent tests revealed that the package contained one kilogram of cocaine. (*See* Gov. Ex. 5.) (Tr. 81–82.) This incident forms the basis of Count Twelve of the third superseding indictment.

On May 3, 1993, agents from the FBI and the Internal Revenue Service executed a search warrant at 29942 Avondale, Inkster, Michigan, the home of Defendant's mother, Betty Wimberly. (Tr. 24, 65–66, 71) (Gov.Ex. 2.) At the time of this search, the agents were aware of an outstanding warrant for Defendant's arrest. (Tr. 66.) Betty Wimberly was present during the search, and the agents informed her of the outstanding arrest warrant and of their interest in Defendant's whereabouts. (Tr. 25–26, 66–67.) The agents also advised Ms. Wimberly that it would be in her best interest and Defendant's best interest if she would reveal Defendant's whereabouts or convince him to surrender. (Tr. 67–68.)

Ms. Wimberly informed the agents that Defendant was not staying at the Avondale residence, but rather, that he was staying with his girlfriend and that she did not know his whereabouts. (35–37, 67.) Agent Stejskal, who was present at the time of the search, requested that Ms. Wimberly contact him if she became aware of Defendant's whereabouts. (Tr. 68.) Agent Stejskal provided Ms. Wimberly with his business card and also noted law enforcement contact information on the copy of the search warrant given to Ms. Wimberly. (Tr. 68.) Ms. Wimberly never made contact with any law enforcement agencies following the May 3, 1993, search of her home. (Tr. 68–69, 95.) Moreover, law enforcement officers did not return to the Avondale residence or contact Ms. Wimberly at any time after May 3, 1993. (Tr. 26–27, 69.)

Also on May 3, 1993, FBI agents and local law enforcement officers visited an apartment in Westland, Michigan for the purpose of arresting Defendant. (*See* Gov. Ex. 3.) At the Westland apartment, the officers encountered Carla Hightower, Defendant's girlfriend at the time. (*See* Gov. Ex. 3.) Ms. Hightower informed the agents that she and Defendant had been living in the apartment since January. (*See* Gov. Ex. 3.) Ms. Hightower also indicated that she had last heard from Defendant on Friday, April 30, when he had called and stated that he was in Toledo, Ohio visiting a friend named Bryan. (*See* Gov. Ex. 3.) Defendant had not indicated to Ms. Hightower how long he would be in Toledo. (*See* Gov. Ex. 3.)

During the time that the agents were speaking with Ms. Hightower, her parents, James and Sylvia Hightower, arrived at

---

1. The parties apparently agreed to waive any hearsay objections to the evidence presented at the hearing. (*See* Tr. 79.)

the Westland apartment. (*See* Gov. Ex. 3.) The officers informed the Hightowers of the outstanding warrant for Defendant's arrest. (*See* Gov. Ex. 3.) FBI Agent Paul Grudek obtained James Hightower's telephone numbers and home address in Plymouth, Michigan. (*See* Gov. Ex. 3.) Agent Grudek contacted James Hightower on May 5, 1993, and Mr. Hightower informed the agent that he had spoken with Defendant by telephone on May 4, 1993. (*See* Gov. Ex. 3.) James Hightower stated that he had advised Defendant to surrender. (*See* Gov. Ex. 3.)

The FBI contacted James Hightower again on May 11, 1993, and at that time Mr. Hightower stated that he had not heard from Defendant. (*See* Gov. Ex. 3.) On June, 8, 1993, James Hightower stated that he had made no contact with Defendant and that his daughter, Carla Hightower, had moved out of the Westland apartment and was residing with her parents in Plymouth. (Gov.Ex. 3.) The FBI had no further contact with the Hightowers after June 8, 1993. (Tr. 77, 95.)

Between 1993 and 1998, the FBI made only "routine contacts" with local police authorities in an effort to locate Defendant. (Tr. 87.) From 1993 until Defendant's arrest, the FBI received periodic contacts from local police in Michigan who had apprehended individuals believed to be Defendant, but, upon fingerprinting, proved not to be Defendant. (Tr. 98.) Based upon the FBI's initial contact with Betty Wimberly on May 3, 1993, the FBI considered Ms. Wimberly to be uncooperative in the investigation of Defendant's whereabouts. (Tr. 94–95, 105.) In this regard, the FBI thought it counterproductive to return to Ms. Wimberly for additional information because of the concern that Ms. Wimberly might alert Defendant to the investigation. (Tr. 105.) Moreover,

the FBI did not believe that Defendant was residing with his mother. (Tr. 95.)

Defendant may have resided with his mother at times between 1993 and 2002. (Tr. 23–24, 46, 49). However, Defendant also resided on and off with at least two girlfriends during this period. (Tr. 23–24, 46, 49.) The FBI did not believe that Defendant was residing in Michigan. (Tr. 82–83). Rather, the FBI believed that Defendant was traveling across the country in connection with a drug trafficking organization that had been run by co-defendant Olee Robinson. (Tr. 84–85.) The FBI was aware that Robinson had utilized a twin-engine airplane for the purpose of drug trafficking. (Tr. 85.) Thus, the FBI believed the Robinson organization to be highly mobile, with members of the organization utilizing multiple addresses and false identities. (Tr. 85, 88.) The Robinson organization had utilized Jerry Davis, an employee at the Michigan Secretary of State's office, to obtain fraudulent driver's licences. (Tr. 88.) Mr. Davis in fact was convicted of issuing such fraudulent documents. (Tr. 88.) The FBI therefore believed that Defendant was utilizing such false identification. (Tr. 88, 91, 115.) The 1993 trial of the other members of the Robinson organization generated publicity in the Detroit area. (Tr. 77–78.) (*See* Gov. Ex. 4.)

Beginning in 1998 and continuing through the date of his arrest on September 3, 2002, Defendant was employed at Ford Motor Company (now Visteon Corporation) at its Rawsonville Plant in Ypsilanti, Michigan. (Tr. 26, 53.) (*See* Def. Ex. 4.) At the time of his arrest, however, Defendant was on a medical leave of absence from the Visteon Corporation due to "severe depression." (Tr. 47–48, 99.) The FBI subsequently learned from Visteon Corporation that Defendant had been residing with a girlfriend up until January,

2002, and not at the Avondale address in Inkster, Michigan. (Tr. 99–100.) The FBI was not aware of Defendant's employment at the Visteon Corporation, and Defendant's mother never informed the FBI of this fact. (Tr. 100.) Moreover, the FBI did not believe that Defendant was maintaining legitimate employment because of the amount of income that he was allegedly generating from drug trafficking. (Tr. 100–01.) Following Defendant's arrest in 2002, the FBI learned that between 1985 and 2001, Defendant had filed only one tax return, that being in the year 2000. (Tr. 101–03) (*See* Gov. Ex. 10 & 11.) On his year 2000 tax return, Defendant listed his address as 29942 Avondale, Inkster, Michigan. (Tr. 103) (*See* Gov. Ex. 11).

On September 3, 2002, in Phoenix, Arizona, Defendant was arrested by Phoenix Police Department officers in a room from which the officers seized $291,476 in cash and a small amount of marijuana. (Tr. 99.) (*See* Gov. Ex. 6.) At the time of his arrest, Defendant identified himself as "Darrel Chandler," (*see* Gov. Ex. 6.), and carried a State of Colorado identification in the name of "Darryl Michael Chandler." (Tr. 97, 112, 122) (*See* Gov. Ex. 6 & 9.) Defendant's Colorado identification in the name of Darryl Michael Chandler was issued on October 21, 1998, and listed an address of 12513 Kansas Place, Apartment 202, Aurora, Colorado, and a date of birth of November 14, 1969. (*See* Gov. Ex. 9.) The Phoenix Police Department contacted Agent Cecil at the FBI's Flint office regarding the arrest of Darryl Chandler, and Agent Cecil requested that the alleged Mr. Chandler be fingerprinted. (Tr. 97–98.) The fingerprint check revealed that Mr. Chandler was actually Defendant, Shawn Wimberly. (Tr. 98.)

In addition to the false Colorado identification, Defendant possessed State of Michigan driver's licenses in the names of "Dar-ryl Michael Chandler" and "Dwight Smith." (Tr. 92–94) (*See* Gov. Ex. 7 & 8.) At his bond hearing before the Magistrate Judge, Defendant admitted to having used the aliases Darryl Chandler and Dwight Smith. (*See* Gov. Ex. 7., Bond Hr'g Tr. at 7.) The Michigan driver's license in the name of Darryl Michael Chandler, which expired on November 14, 2001, listed an address of 25952 Norfolk, Inkster, Michigan, and a date of birth of November 14, 1969. (*See* Gov. Ex. 8.) The Michigan license in the name of Chandler was suspended on December 11, 2000, due to Defendant's failure to appear in court for a traffic violation (Tr. 93.) (*See* Gov. Ex. 8.) Defendant's Michigan driver's license in the name of Dwight Smith, which expired on August 5, 1993, listed an address of 12914 Burt Road, Detroit Michigan, and a date of birth of November 14, 1965. (*See* Gov. Ex. 7.) Defendant's actual date of birth was May 5, 1969. (*See* Gov. Ex. 5 & 7.)

## II. DISCUSSION

Defendant argues that the delay of over nine years between his indictment and arrest violated his right to a speedy trial under the Sixth Amendment, Rule 48(b) of the Federal Rules of Criminal Procedure, and the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.* The Court now addresses each of Defendant's claims.

### A. THE SIXTH AMENDMENT

■ The Sixth Amendment to the United States Constitution guarantees that: "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court identified four factors for courts to weigh in determining whether a violation of the Sixth Amendment's Speedy Trial

Clause has occurred: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. 2182.

The Court also noted:

[w]e regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

*Id.* at 533, 92 S.Ct. 2182 (footnote omitted).

In *Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), the Supreme Court reaffirmed the *Barker* test but restated the four factors as follows: (1) "whether delay before trial was uncommonly long"; (2) "whether the government or the criminal defendant is more to blame for that delay"; (3) "whether, in due course, the defendant asserted his right to a speedy trial"; and (4) "whether he suffered prejudice as the delay's result." *Id.* at 651, 112 S.Ct. 2686.

**1. LENGTH OF DELAY**

██ "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker,* 407 U.S. at 530, 92 S.Ct. 2182. If the defendant makes a showing that the delay was "presumptively prejudicial," "the court must then consider,

as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett,* 505 U.S. at 652, 112 S.Ct. 2686. Generally, presumptive prejudice exists when the post-indictment delay approaches one year. *See id.* at 652 n. 1, 112 S.Ct. 2686.

Here, approximately nine years and four months passed between Defendant's indictment on April 30, 1993, and his arrest on September 3, 2002. The Government appears to concede that the delay in this case constitutes the type of presumptive prejudice sufficient to trigger the speedy trial inquiry under *Barker,* and the Court agrees. *See United States v. Graham,* 128 F.3d 372 (6th Cir.1997) (finding presumptive prejudice sufficient to trigger speedy trial inquiry after delay of almost eight years between indictment and trial). Accordingly, the Court will analyze Defendant' claim under the *Barker* factors.

**2. REASON FOR DELAY**

"[T]he prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner, and thus, the burden is on the prosecution to explain the cause of the pre-trial delay." *Graham,* 128 F.3d at 374 (internal quotation marks and citations omitted). Moreover, the Government "is under an obligation to exercise due diligence in attempting to locate and apprehend the accused, even if he is a fugitive who is fleeing prosecution." *Rayborn v. Scully,* 858 F.2d 84, 90 (2d Cir.1988). However, "law enforcement officials are not expected to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension or who has fled to parts unknown." *Id.*

Here, the Government asserts that the delay between Defendant's indictment and

arrest is attributable to Defendant's efforts to evade arrest. In support of this contention, the Government refers to the incident on February 17, 1993, when Defendant fled the scene of a traffic stop in Westland, Michigan, allegedly tossing one kilogram of cocaine out the window of his vehicle in the process. The Government also argues that Defendant has maintained multiple identities and addresses for the purpose of evading apprehension. In opposition, Defendant contends that the Government was less than diligent in attempting to locate him. In this regard, Defendant asserts that he was employed in Ypsilanti, Michigan by the Visteon Corporation since 1998 under his own name and social security number. Defendant also contends that, after May, 3 1993, the Government made no further attempt to contact his mother or to locate him at the Avondale residence in Inkster, Michigan where allegedly he resided with her.

Based upon the evidence submitted in this matter, the Court concludes that the Government was reasonably diligent in its efforts to arrest Defendant and that the delay in this case is attributable to Defendant's efforts to evade apprehension. A number of facts uncovered at the evidentiary hearing support this conclusion.

First, the record reflects that the Government's attempts to locate Defendant were met with resistance from the outset of the investigation. For instance, the Government contacted Defendant's mother on May 3, 1993, during a search of her home at 29942 Avondale, Inkster, Michigan. It appears fairly clear that Defendant's mother either had very little information to offer regarding Defendant's whereabouts or was simply less than cooperative. The Government also contacted Defendant's girlfriend, Ms. Hightower, on May 3, 1993, in an attempt to locate Defendant. Based upon this contact, the FBI learned that Defendant was in an undisclosed location near Toledo, Ohio. On May 5, 1993, the FBI learned that Ms. Hightower's father, James Hightower, had spoken with Defendant on the previous day, urging Defendant to surrender. Despite this advice from Mr. Hightower, however, Defendant remained at large.

Second, the evidence reveals that Defendant facilitated his evasion of law enforcement authorities by using multiple identities. Telling in this regard is the fact that, upon his arrest in Phoenix, Arizona, Defendant provided police with one of his false identities, clearly in an attempt to escape identification. Also illustrative of Defendant's efforts to evade arrest is the February 17, 1993, incident in which Defendant fled the scene of a traffic stop, allegedly discarding one kilogram of cocaine from his vehicle in the process. Although this incident occurred prior to his indictment, it supports the Government's contention that Defendant is an individual who was committed to evading arrest. Furthermore, although Defendant's mother testified that Defendant primarily resided with her from 1993 through the time of his arrest, the record reflects that Defendant led a much more transient lifestyle. Defendant resided with at least two girlfriends and traveled out of state for periods of time to such places as Ohio, Arizona, and possibly Colorado. Moreover, Defendant allegedly was associated with a multistate drug trafficking organization.

Third, the Court concludes that the FBI was reasonably diligent in its efforts to arrest Defendant, particularly in light of the affirmative acts that Defendant took to evade arrest. Defendant makes much of the fact that the FBI did not contact his mother or the Hightowers after its initial contacts with these individuals in 1993. Yet, the record demonstrates that Defendant's mother was less than helpful in the

investigation of Defendant's whereabouts and that any further contact with her may have been counterproductive. In addition, the FBI did make sufficient contact with Ms. Hightower and her family, only to learn that, when urged to surrender, Defendant apparently chose to remain at large. Defendant also questions the FBI's failure to set up surveillance outside his mother's residence or the Hightower's residence. While in hindsight such a tactic *may* have provided information as to Defendant's whereabouts, the Court is not convinced, given Defendant's transient lifestyle, that surveillance necessarily would have resulted in Defendant's apprehension. Finally, Defendant's claim that the FBI could have located him while he was working at the Visteon Corporation in Ypsilanti, Michigan is highly implausible. Defendant did not begin working at Visteon until 1998, some five years after the initial investigation began. Given the FBI's justified belief that Defendant was at large, likely out of state, it is not at all reasonable to expect that the FBI could have located Defendant through his employment at Visteon. Even if the FBI had suspected that Defendant had assumed legitimate employment after five years at large, the agency would have needed a fantastic combination of luck and guesswork in order to locate Defendant at the Visteon Corporation in Ypsilanti. There are, of course, thousands of employers in the State of Michigan alone, and the Court cannot begin to imagine the efforts that would have been required to locate Defendant at one particular place of business.

Therefore, based upon the record in this case, the Court concludes the that the Government was reasonably diligent in its efforts to arrest Defendant and that the delay in this case is attributable to Defendant's efforts to evade apprehension. Accordingly, the second factor weighs against granting relief to Defendant.

### 3. DEFENDANT'S ASSERTION OF HIS RIGHT

The Supreme Court in *Barker* explained:

> Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

407 U.S. at 531–32, 92 S.Ct. 2182.

The Government argues that the third factor weights against Defendant because he did not assert his right to a speedy trial until after his arrest in September, 2002. The Government further asserts that Defendant must have been aware of the charges against him due to the publicity surrounding the trial of his co-defendants and Defendant's decision to use multiple identities to evade arrest. For the following reasons, the Court agrees with the Government's analysis.

First, as noted above, Defendant was made aware of the outstanding warrant for his arrest as early as May 4, 1993, by his girlfriend's father, James Hightower. Second, the record reflects that the FBI contacted Defendant's mother on May 3, 1993, informed her of the outstanding warrant for Defendant's arrest, and requested that she either contact the FBI as to Defen-

dant's whereabouts or urge Defendant to surrender himself. If, as Defendant contends, he truly did reside with his mother from 1993 to the present time, then he undoubtedly should have been aware at some point that the FBI was interested in locating him. Third, the record reflects that the trial of the other members of the Robinson organization, Defendant's co-defendants, generated publicity in the Detroit area. Thus, Defendant should have been aware that he was mentioned along with his co-defendants in this publicity. Fourth, Defendant's use of multiple identities strongly suggests that his purpose was not to assert his right to a speedy trial, but rather, to evade arrest. In light of this record, Defendant's failure to assert his right to a speedy trial until after his arrest weighs against him. *See United States v. Mitchell*, 957 F.2d 465, 469 (7th Cir.1992) (holding that fugitive defendant's failure to assert right to a speedy trial weighs against him under the *Barker* analysis).

### 4. PREJUDICE TO DEFENDANT

"[U]nreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including 'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." *Doggett*, 505 U.S. at 654, 112 S.Ct. 2686 (quoting *Barker*, 407 U.S. at 532, 92 S.Ct. 2182) (alteration in original). Moreover, "[o]f these forms of prejudice, 'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Id.* (quoting *Barker*, 407 U.S. at 532, 92 S.Ct. 2182). The Sixth Circuit requires a showing of "substantial prejudice." *See United States v. DeClue*, 899 F.2d 1465, 1471 (6th Cir. 1990).

Obviously, the first type of prejudice does not apply in the present case because Defendant was not subjected to pretrial detention between his indictment and arrest. Moreover, Defendant makes no claim of the second type of prejudice, that the lengthy delay caused him anxiety and concern. Rather, Defendant claims the last type of prejudice, arguing that the approximately nine year delay between his indictment and arrest has deprived him of the opportunity to prepare for his defense. In this regard, Defendant contends only that he "is unable to recall or locate those witnesses who would testify favorably on his behalf." (Mot. at ¶ 8.) In response, the Government argues that Defendant has not articulated any *specific prejudice* to his defense, noting that Defendant has not identified the witnesses that are unavailable or explained why those witnesses are unavailable. The Government further argues that the incidents at issue in the indictment can be proved merely through the eyewitness accounts of law enforcement officers. (Tr. 130–32.)

"[P]retrial delay is often both inevitable and wholly justifiable." *Doggett*, 505 U.S. at 656, 112 S.Ct. 2686. For example, "[t]he government may need time to collect witnesses against the accused, oppose his pretrial motions, or, *if he goes into hiding, track him down.*" *Id.* (emphasis added). Therefore, if the Government pursues a defendant with "reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as [the defendant] could not show specific prejudice to his defense." *Id.*

Here, Defendant has failed to demonstrate any specific prejudice to his defense, and his generalized claim that he is unable to recall the names of witnesses is unavailing. *See United States v. Huff*, 246

F.Supp.2d 721, 727–28 (W.D.Ky.2003) (holding that "conclusory statements concerning memory impairment are insufficient to show actual, substantial prejudice") (citing *United States v. Mulligan*, 520 F.2d 1327, 1333 (6th Cir.1975)). Moreover, as the Court has discussed above, the Government was reasonably diligent in its efforts to apprehend Defendant, and any delay is attributable to Defendant's attempts to evade arrest. Accordingly, the fourth factor in the *Barker* analysis weighs against Defendant.

The Court concludes, therefore, upon consideration of Defendant's Sixth Amendment claim under all of the factors set forth in *Barker*, that Defendant has not suffered a violation of his Sixth Amendment right to a speedy trial.

## B. Rule 48(b)

▉ Rule 48(b) of the Federal Rules of Criminal Procedure permits courts to "dismiss an indictment ... if unnecessary delay occurs in ... bringing a defendant to trial." Fed.R.Civ.P. 48(b). "This provision not only allows a court to dismiss an indictment on constitutional grounds, but it also restates the court's inherent power to dismiss an indictment for lack of prosecution where the delay is not of a constitutional magnitude." *United States v. Goodson*, 204 F.3d 508, 513 (4th Cir. 2000) (internal citations omitted). Because a court's "[inherent] power is not circumscribed by the Sixth Amendment[,][t]he court can dismiss whenever there has been unnecessary delay without being required to decide whether the delay was of such a nature as to deprive the defendant of a constitutional right." 3A Charles A. Wright, *Federal Practice & Procedure* § 814 (2d ed.1982 & supp.2002) (footnoted omitted).

To analyze claims under Rule 48(b), courts have applied the four factors identified in *Barker v. Wingo* for the analysis of speedy trial claims under the Sixth Amendment. *See, e.g., United States v. Ward*, 211 F.3d 356, 361–62 (7th Cir.2000); *United States v. McRaven*, 43 F.3d 1473, 1994 WL 679372, at *4 n. 3 (6th Cir.1994); *United States v. LaBorde*, 496 F.2d 965, 967 (6th Cir.1974); *United States v. McLemore*, 447 F.Supp. 1229, 1237 (E.D.Mich. 1978); *United States v. Rowbotham*, 430 F.Supp. 1254, 1257 (D.Mass.1977). The Court discussed the *Barker* factors in its analysis of Defendant's Sixth Amendment claim and concluded that Defendant was not entitled to relief. Applying the Court's Sixth Amendment discussion and analysis to Defendant's Rule 48(b) claim produces the same result. Accordingly, the Court concludes that Defendant is not entitled relief under Rule 48(b).

## C. THE SPEEDY TRIAL ACT

▉ Defendant also cites the Speedy Trial Act as a basis for dismissal of the indictment. The Speedy Trial Act provides, in relevant part:

In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1). The Speedy Trial Act allows for certain periods of delay to be excluded from the time within which trial must begin. *See* 18 U.S.C. § 3161(h). One such provision allows for the exclusion of "[a]ny period of delay resulting from the absence or unavailability of the defendant." 18 U.S.C. § 3161(h)(3)(A).

Here, Defendant contends that, for purposes of the Speedy Trial Act, the Government may not rely upon § 3161(h)(3)(A) for the purpose of excluding time because the Government was not diligent in locating him. Thus, Defendant appears to argue that dismissal is warranted because he was not brought to trial within the period prescribed under the Speedy Trial Act. *See* 18 U.S.C. § 3162(a)(2) ("If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant."). Defendant's argument is without merit. As noted above, the seventy day period allotted under the Speedy Trial Act commences on "the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, *whichever date last occurs.*" 18 U.S.C. § 3161(c)(1) (emphasis added). In this case, Defendant did not make an initial appearance until October 4, 2002. Thus, the seventy day period under the Speedy Trial Act did not begin to run until that date. However, Defendant premises his motion to dismiss on the period of delay between his indictment in May, 1993 and arrest in September, 2002. Thus, Defendant is challenging a delay that occurred prior to the date on which the clock began to run under the Speedy Trial Act. Accordingly, Defendant has suffered no violation of the Speedy Trial Act. *See Ward,* 211 F.3d at 360.

## III. CONCLUSION

Accordingly, this Court being fully advised in the premises,

**IT IS HEREBY ORDERED** that Defendant's Defendant's motion to dismiss the indictment [docket entry 497] is **DENIED.**

**SO ORDERED.**